## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| ATC HEALTHCARE SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| RCM TECHNOLOGIES, INC. and | ) | |
| THE BOARD OF EDUCATION OF THE | ) | |
| CITY OF CHICAGO. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

### COMPLAINT

NOW COMES the PLAINTIFF, ATC HEALTHCARE SERVICES, INC., by and through their attorneys, THE NORTHCUTT FIRM, P.C. and COFFMAN LAW OFFICES, P.C., and for its Complaint against Defendants, RCM TECHNOLOGIES, INC and the BOARD OF EDUCATION OF THE CITY OF CHICAGO ("CPS"), who states as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff, ATC HEALTHCARE SERVICES, INC (hereinafter, "ATC"), is a health care staffing corporation headquartered in Georgia that provides health care staffing needs to clients throughout the United States.

2. Plaintiff ATC maintains its principal place of business in New York, where the corporation's officers direct, control and coordinate ATC's activities through a nationwide franchise network that includes offices in Illinois.

3. Defendant, RCM Technologies, Inc. (hereinafter, "RCM"), is a publicly traded corporation engaged in the business of, *inter alia*, providing "business and technology solutions" through "the adaptation and deployment of advanced engineering, information technology and specialty health care services."

4. RCM is headquartered in Pennsauken, New Jersey, where the corporation's officers direct, control, and coordinate the corporation's activities, including RCM Healthcare, an internal division of RCM Technologies that provides medical staff to health care institutions.

5. Defendant Board of Education of the City of Chicago (hereinafter, "CPS") is headquartered in Chicago, Illinois, where the CPS Board directs, controls, and coordinates the governance, organizational and financial oversight of the Chicago Public Schools (CPS).

6. This Court has jurisdiction of the action pursuant to 28 U.S.C § 1332, as there is complete diversity between the parties which are corporate citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7. Venue is proper under 28 U.S.C. §1391(b), as the vast majority of events giving rise to the claims asserted in this complaint occurred within this District.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### *ATC Healthcare and CPS*

8. On November 1, 2006, Plaintiff reached an agreement whereby ATC was to provide outsourced healthcare services to CPS focusing on children with serious and often profound physical and medical needs who attend CPS schools and require individualized care. The terms and conditions of the agreement were memorialized in an initial contract that was awarded to ATC for a two year period commencing on November 1, 2006 and continuing to March 31, 2008.

9. After the expiration of the initial two year contract and a subsequent two year extension, a second contract was executed in March 2010 (*hereinafter the "2010 Contract "attached hereto as Exhibit 1*). This contract was subsequently renewed in 2012 and 2014, subject to most of the same terms and conditions as the original.

10. The 2010 Contract provided that rates for the services of ATC personnel would be *guaranteed* for that two-year period they were assigned to CPS, as did the most recent contract extension which provided for the continuous placement of ATC staff in CPS assignments from July 1, 2014 to June 30, 2016 (*hereinafter, the "2014 extension," a copy of which is attached hereto as Exhibit 2*).

11. The CPS contract and the various extensions thereof vested broad discretionary powers in the ability of CPS to unilaterally regulate the services of ATC nurses assigned to CPS.

12. By contrast, ATC was strictly bound to the terms of the commitment it made to provide contract nurses to CPS as required and, under the terms of the CPS contract

and the various extensions thereof, could be required to pay money damages and/or would be subject to injunctive remedies if they failed in this regard or otherwise attempted to withhold the services of ATC nurses.

13. At all times relevant hereto, ATC and CPS were bound by an implied covenant of good faith and fair dealing with respect to the CPS contract and its extensions. Notwithstanding the broad discretionary powers held by CPS over ATC, the parties intended that a fair and reasonable limit on the use of this contractual discretion would exist and that CPS would not exercise their contractual discretion arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

14. At all times relevant hereto, it was understood between the parties that ATC had a reasonable expectation that it would be paid the rates it was guaranteed under its contract as long as ATC nurses were assigned to CPS schools and for a number of years, this expectation had always been met.

15. Despite their broad discretionary powers, CPS had no contractual right to reduce the guaranteed rates it would pay for ATC nurses, nor did it retain an option to hire away ATC nurses to work in CPS assignments, either directly for CPS or its designee. ATC's right to payment for the services of their nurses was not subject to any contractual provision that would allow that right to be taken over by CPS or transferred to a third party without the consent of ATC unless there was an event of default by ATC.

16. Specifically, the 2010 contract contained a prohibition stating that "…neither party may assign this Agreement or any obligations imposed hereunder without the prior written consent of the other party." *Ex. 1*, p. 23, ¶ 19.

17. The only instance in which CPS and/or a third party at the direction of CPS could arguably "take over" ATC's nurses assigned to CPS was in an "Event of Default" as defined by Sections 10.1 and 10.2. Section 10.2(a) provides, *inter alia*, that under certain circumstances, the Board may, "Take over and complete the Services or any part thereof, either directly or through others, as agent for and at the cost of Contractor. In such event, Contractor shall be liable to the Board for any excess costs incurred by the Board…"

18. Throughout its dealings with CPS, ATC relied on the expectation that CPS would conduct itself in an honest and forthright manner with respect to the exercise of its contractual discretion, as ATC was necessarily required to spend considerable time and money to recruit, train, staff and supervise nurses and other professionals who were hired as ATC employees and subsequently assigned to CPS and whose administrative costs were borne exclusively by ATC.

*The Employment Agreements and Restrictive Covenants of ATC's Nurses*

19. Since 2006, the nature of the assignments for ATC nurses assigned to CPS was demanding and particular to the needs of individual students, who, by virtue of their physical and/or medical challenges, required continuity of care and individualized attention by healthcare professionals who were attuned to their needs.

5

20. The professionals in these assignments performed vital services for disabled and special needs children, many of whom were entirely dependent on them throughout the school day. These services included, *inter alia*, gastronomy tube feeding, tracheostomy care, ventilator care, medication through a nebulizer or other routes, assistance with range of motion and movement, the administration of medication, as well as urinary and bowel care.

21. The nurses who worked with CPS students were all highly trained, had unique skill sets and extensive familiarity with the CPS students in their charge, many of whom were medically fragile children in difficult circumstances. Certified school nurses, health service nurses and licensed practical nurses employed by ATC were all placed in CPS assignments pursuant to the original contract and its extensions.

22. Some nurses recruited and trained by ATC had specific language skills that allowed them to work with ESL and/or special needs students, including nurses who were fluent in the Spanish, Nigerian, Polish, Bwamucwi, Yorba and Sign Languages.

23. Each of the healthcare professionals hired by ATC to work at CPS were *employees of ATC*, paid on a W-2 basis and eligible for benefits such as health care coverage and unemployment compensation.

24. Each of the healthcare professionals hired by ATC to work at CPS were subject to the terms and conditions of the ATC Healthcare Employment Agreement (hereinafter, "Employment Agreement"), which they were required to sign as a condition of employment with ATC. (*Representative Copies of the Employment Agreements are attached hereto as Exhibit 3).*

6

25. The Employment Agreement specifically provides that each worker is employed by ATC as an employee-at-will, and not as an employee of the patient, CPS or any affiliates of CPS.

26. The Employment Agreement specifically prohibits the disclosure of confidential information and requires the worker (identified as "HCA") to agree to the following provision:

> 4    Agreement Not to Solicit or Accept work from the Client.
>   a.   HCA shall not directly, or indirectly, seek or accept employment by or engage as an independent contractor by CPS or any affiliates. The waiting period for employment to CPS is 1 year following resignation from ATC.
>        ATC may condition such consent upon payment of a fee or other compensation from HCA.

27. The majority of ATC nurses assigned to CPS were long-term employees of ATC, who had more than two years of successive employment with ATC and whose Employment Agreements were renewed each school year in which they were to continue working at CPS, so that their collective obligation under the yearly contracts exceeded a two-year period.

28. The employment agreement for each ATC employee assigned to CPS was, as a matter of routine practice within ATC, reviewed and approved by CPS. Throughout the course of its work at CPS, ATC and its nurses were evaluated by CPS using a wide spectrum of performance metrics.

29. At all times relevant hereto and in the course of it nine-year history with CPS, ATC had established an exemplary track record of performance and had earned a 100% rating in almost every category of evaluation, the highest level of performance for a

vendor of its kind within CPS. At no time in its history with CPS did ATC conduct itself in any manner as to trigger an Event of Default as defined by Section 10.1 of the contract and at no point has CPS ever formally or informally suggested otherwise or served ATC with a Default Notice as provided in Section 10.2.

30. In addition to the work by its nurses, ATC and Cindy Weiner – the franchise owner and manager of ATC's local office based in Palos Heights, Illinois – routinely provided consulting services to CPS in the development and implementation of CPS's nursing strategy throughout the CPS system.

### CPS and RCM Plan for Take Over of ATC Nurses Absent an ATC Event of Default

31. Notwithstanding the exemplary record by ATC within CPS, on or about November 21, 2014, CPS issued a request for proposals ("RFP") in which it solicited competitive bids for outsourced healthcare staffing needs.

32. Consistent with its contractual commitment to CPS that extended to June 2016 and in view of the fact that ATC had already been selected on four previous occasions to renew its contract after establishing a flawless record with CPS, ATC submitted its bid in response to the RFP on or about February 4, 2015. The submission of the 2014 bid by ATC in no way abrogated its rights under the 2014 contract extension, nor was such a possibility ever raised by CPS before or after the bid was submitted.

33. In addition to the ATC bid, approximately 10 other firms submitted similar proposals, including RCM.

34. RCM had no Chicago office prior to the CPS bid, had never previously worked with CPS on any sizable project, had no healthcare professionals working for CPS prior to the RFP, had no staff nurses in Chicago who were fully trained and capable of immediate assignments within CPS and had absolutely no experience with CPS special needs and disabled children prior to submitting its bid.

35. Unbeknownst to ATC and the other vendors who had previously provided nursing services to CPS, the RCM bid proposed a scheme whereby RCM would "take over" the existing agency nurses, including the health care professionals who were employees of ATC and subject to the restrictive covenants in the Employment Agreements.

36. The RCM bid was explicit in assuring CPS that it could not only function as the sole provider of nursing services, but would actually "take over" the nurses themselves who were already employed by ATC and other agencies.  In this regard, RCM predicted they could accomplish this feat with ease, as "inheriting existing nurses is something we come across on an annual basis" and "nurses approached by RCM have switched with considerable ease."

37. Throughout its written submissions to CPS in support of its bid, RCM repeatedly referred to its ability to "take over" or "inherit" existing agency nurses as a cornerstone of its strategy to become the exclusive vendor for the Chicago Public Schools and the recipient of a 30 million dollar CPS contract.  (*Copies of RCM submissions in support of its bid are attached hereto as Exhibits 4 and 5*).

38. In its bid, RCM falsely claimed that it would use a "rigorous interview, screening and evaluation process" when selecting nurses for CPS assignments and that, "[a]fter the interview, a thorough background check and references are completed on each candidate prior to hiring…" It further made the false claim that it had "100 nurses ready" to staff CPS schools should they not be able to hire all the existing agency nurses.

39. Acknowledging the very real harm that might befall families of special needs children should there be a gap in nursing care, RCM stated in its bid, "Like RCM, the parents only want the best care for their children when they attend school and the last thing they want on the first day is to be taken by surprise, i.e. a new vendor or nurse…"

40. In truth, the designs of RCM to "take over" and/or "inherit" the nurses was nothing more than an agreement to allow RCM to step into role of ATC and take over management of the services provided by ATC nurses, in violation of the provision of Section 10.2 that requires any "take over" to be predicated on an Event of Default.

41. The claims of a "rigorous interview, screening and evaluation process," insofar as they pertained to the ATC nurses they sought to take over, were illusory, as RCM had no intention of doing anything other than identifying who the ATC nurses were so they could re-sign them with RCM – the rigorous interview, screening and evaluation had already been done by ATC at their expense.

42. Following the submission of the bid and at a time when CPS and RCM officials were actively planning to execute the scheme for RCM to take over ATC's nurses, ATC

continued to recruit, train and staff health care professionals in accordance with the CPS 2014 contract extension, unaware of what CPS and RCM had in store for the very same nurses ATC was employing and offering benefits to.

43. For its part, CPS officials concealed their active plans to arrange to have RCM take over its employees. In furtherance of this effort, CPS continued to utilize and participate in ATC's in-house training programs, fully aware of the fact that CPS intended that these same employees would later be taken over by RCM and that RCM, and not ATC, would be paid for their services.

44. Following the submission of the ATC bid and at a time when CPS and RCM were actively planning the takeover of ATC's nurses, the CPS Board postponed, on more than one occasion, a vote and a public announcement as to which firm(s) would be awarded new contracts under the RFP.

45. As this occurred, CPS officials withheld from ATC the fact that they intended to allow RCM to take over its nurses in the absence of a default by ATC, as well as any information as to where ATC stood in relation to the other firms with respect to the RFP bidding process. At no time during this period did CPS in any way indicate that they would prematurely terminate the 2015-16 contract extension with ATC, irrespective of who would ultimately emerge as the successful bidder(s), or that ATC had triggered an Event of Default.

46. By contrast, after the bidding process was closed and well before any public discussion on the issue, RCM received private assurances from CPS officials that, irrespective of the fact that the CPS Board had not even voted on the bids, that RCM

11

would be awarded the new contract and that none of the other firms would be selected.

47. As ATC and other firms were left in the dark as to what CPS intended to do with the respective bids and more than one month before the CPS Board was scheduled for a final vote on the question of which bid would ultimately be successful, RCM issued a press release intimating that it would be selected as the "exclusive vendor for school nursing services" for the Chicago Public School System.

48. For its part, CPS gave no indication of its intention to collude with RCM to take over management of ATC's nurses assigned to CPS and continued to conceal its intention of working with RCM to dispossess ATC of *both* its profits under the contract and the services of their own employees. On the contrary, CPS officials took deliberate steps to create the appearance that ATC nurses would be returning to finish the last year of their contract extension.

49. For example, on June 8, 2015, Weiner submitted a copy of ATC's 2015-2016 employment agreement for its CPS nurses to Linda Clarke at CPS for approval. On June 10, 2015, Clarke replied, "Thanks Cindy. This looks great."

50. On June 9, 2014, a CPS representative contacted ATC via email, stating, "Can you send me one final list of your nurses assignments. If any of them go to multiple schools, please group those schools together under that nurse. I need it by Friday. Thanks so much!"

51. Per the request of the CPS representatives, information on all ATC nurses assigned to CPS – including their names, home addresses, emails and social security numbers

– were provided as requested, along with a list of which schools and students they were assigned to and private health information related to their special needs.

52. On or about June 16, 2015, Weiner received a call from Amanda Bochenek and Abigail Rollins from CPS procurement stating that the ATC contract would not be renewed *after* the 2015-16 school year. The following day, Weiner received a letter from a CPS procurement representative Ethan Sinnema that the ATC proposal would not be given the new contract. In both communications, CPS personnel concealed the fact that CPS and RCM were planning to take over management of ATC's nurses assigned to CPS.

53. It was subsequently learned that the new CPS contract would be awarded to RCM, a contract that, by RCM's own public statements, was valued at 30 million dollars.

54. On or about June 16, 2015, Weiner spoke with Sinnema to obtain an explanation as to why the contract proposal was not accepted and what the change would mean at the beginning of school year 2016 when students would be inexplicably denied the services of the caregivers they had grown accustomed to. Sinnema refused to answer any questions, including those regarding the scoring formula, the weight of each question, or why ATC's nearly perfect track record with CPS was not afforded greater weight when compared to a yet untested out-of-state company with no experience with CPS or presence in Chicago. Notably, Sinnema gave no indication of the fact that CPS and RCM were planning to take over management of ATC's nurses assigned to CPS.

55. During the conversation, Sinnema only indicated that a committee of six Board members, including Dr. Kate Foley, Raul Sharma, Dr. Stephanie Whyte, Linda Clarke, Loretha Thomas and Keisha Berry had made the determination that ATC would not be awarded the *next* contract. Sinnema concealed from Weiner the fact that, at that point, a determination had already been made that RCM would take over ATC's nurses, unbeknownst to ATC.

56. Weiner subsequently learned that Dr. Stephanie Whyte had resigned from CPS in March 2015 and that Clarke, Thomas and Berry had been "removed" from the committee.

57. Notwithstanding the fact that the ATC bid was not accepted by CPS, no written notification was given to ATC that CPS was unilaterally suspending or cancelling the existing contract that was not set to expire until June 2016, or that an Event of Default had occurred.

58. Notwithstanding the notification that the ATC bid was not accepted, CPS affirmed the fact that ATC would still be providing nurses to CPS for the remainder of the 2015-16 school year per the terms of the contract extension by CPS . and as recently as June 18, 2015, CPS was requesting new nursing assignments from ATC.

59. As had already been preordained by CPS officials before any public discussion of the bids was allowed, on or about June 24, 2015, the RCM contract bid was approved at a CPS Board meeting.

*RCM and CPS Targets ATC Nurses for Takeover*

60. On June 26, 2015, two days after the RCM bid was approved by the CPS Board, CPS reversed course from its position the previous week and informed ATC that "no agency nurses were needed" for the summer.

61. During this time, CPS provided RCM with the complete list of all ATC employees working in CPS schools prior to the finalization of any written contract between CPS and RCM, including the employees' personal contact details, home addresses and information related to students and/or schools the ATC employees were assigned to.

62. Before any formal contract between CPS and RCM had even been executed and without the ATC contract having been cancelled, RCM began contacting ATC nurses assigned to CPS via phone and email, initially offering them "exclusive" positions at CPS and stating they would be assigned to work with the very same students they were caring for under their ATC contract. These efforts were specifically directed toward nurses who had been with ATC for a considerable period of time and had more than two years of consecutive employment with ATC.

63. In furtherance of this effort, RCM representatives initially indicated to the targeted ATC nurses that they could "apply" for the very same positions with RCM they had just left under the ATC contract. The pattern of RCM representatives aggressively soliciting ATC's employees after being given their personal contact information was repeated multiple times, with scores of ATC's employees being told that RCM was "taking over" their contract and that they had to now work for RCM,

notwithstanding the fact that the ATC contract had not been cancelled, no "taking over" or other assignment of the ATC employment contracts had occurred, and the targeted ATC employees were subject to restrictive covenants in their employment agreements.

64. For its part, CPS representatives joined in the attempt to recruit ATC nurses by calling them directly and urging that they contact RCM in order to return to the previous assignments they held under the ATC contract for the 2015-16 school year. CPS representatives also contacted parents of special needs and disabled students and informed them that if they wanted to ensure continuity of care from the same nurse their child had grown accustomed to, that the ATC nurse assigned to their child would have to work for RCM.

65. As the beginning of the 2015-16 school year approached, RCM's overtures to ATC's nurses became increasingly urgent and purposefully deceptive, with some solicitations intimating that ATC employees were already working for RCM by virtue of their status as the "exclusive staffing agency" for CPS.

66. In unsolicited emails to ATC nurses who were still subject to the terms of the ATC/CPS contract extension, RCM recruiters began to claim that the ATC nurses merely had to "confirm" with them that they were returning to their previous assignments for the 2015-16 school year, in an apparent abandonment of the "rigorous" screening and interviewing process proclaimed in its submissions to CPS.

67. After RCM failed to "take over" the ATC nurses that were promised to CPS, they embarked on a new tactic whereby RCM recruiters sent them emails marked "URGENT – CPS FINGERPRINTS" that stated, in pertinent part:

> URGENT!!
>
> Good Afternoon,
> I just got an update back from CPS and you must UPDATE your fingerprints. Please see attached and explanation below. Read carefully! In order to start on time you MUST complete your prints ASAP. Call me when you can to speak further. Thank you!
>
> **Finger Printing**
> Before you can care for the children of Chicago it is a requirement that you be fingerprinted and cleared to work in CPS. Please see <u>Accurate Biometrics</u> website for acceptable locations. You do **not** need an appointment for fingerprinting as all locations operate on a walk-in basis.
> Please CALL ME so we may fill out the form over the phone and sign the attached **Authorization & Release Form** and bring it to your appointment along with the following: a **valid driver's or license state I.D.** and money order, cashier's check or credit card for a one-time payment of **$59.00.**
> The fingerprint processing can take up to 30 days for ISP and CPS to complete so please try and get this completed ASAP.
>
> *NOTE: you MUST CALL ME to complete this form over the phone. I need to ensure it is filled out correctly, have my manager sign it, and then I will send it back to you.*

68. The efforts by RCM recruiters to target ATC's employees still under the CPS contract was a ruse designed to create the misapprehension that they were now required to report to RCM, despite the fact that they *were still employees of ATC and had never applied for or in any way agreed to work for RCM.* In truth, RCM was notified in writing by CPS as early as March 31, 2015 that all "inherited" nurses would not need to be fingerprinted again for the upcoming school year.

69. In response to the request for ATC employees' fingerprints, several ATC nurses mistakenly believed that their assignments within CPS on behalf of ATC were now confirmed and expressed confusion as to why they were being contacted by RCM

and would be required to pay a fingerprinting fee that ATC had previously paid on their behalf.

70. During this time, RCM recruiters contacted ATC nurses who were assigned to CPS and offered them referral bonuses if those nurses would reach out to other ATC nurses they "have not spoken to" in order to "confirm" them for the 2015-16 school year.

71. Prior to August 13, 2015, CPS representatives had in no way indicated that the 2015-16 contract extension was terminated for any reason or though the exercise of any clause in the contract. On the contrary, until August 13, 2015, CPS maintained that it was reserving its rights under the ATC contract and that ATC might still be called upon to provide nurses for the 2015-16 school year should they so require.

72. Viewed in the context of the various unilateral remedies available to CPS in the event ATC did not perform as required, this meant that ATC could be sued for failing to provide nurses to CPS at a time when CPS was actively aiding RCM in "taking over" those very same nurses.

73. On August 13, 2015, only sixteen business days before the start of the 2015-16 school year, CPS notified ATC for the first time that it was cancelling their contract with CPS.

74. After the August 13th cancellation, RCM representatives continued to call ATC nurses in efforts to "schedule" them in their previous CPS assignments, notwithstanding the fact that they had never been interviewed, screened or hired by CPS or RCM.

75. In the course of these solicitations, RCM recruiters presented themselves as merely facilitating the scheduling of CPS assignments in an effort to deceive the nurses into believing that their attempt to place them back in their assignments at CPS was either permissible and/or ratified by ATC. In response to these schedule requests, nurses contacted ATC and expressed confusion as to why they were being "scheduled" by RCM when they had never applied for RCM and still worked for ATC.

76. On September 8, 2015, Chicago Public School students were set to begin their first day of school. Excluded from participating in the first day of school were scores of special needs children who had previously been assigned an ATC nurse and who were inexplicably denied nursing services based on the actions of CPS and RCM.

77. Throughout the week of September 8, 2015, ATC was inundated with calls from CPS school principals and case managers who were irate that nurses had failed to show up at school and who were under the mistaken belief that – as RCM had falsely represented multiple times – the same ATC nurses who had served the students previously would be available to return for the first day of school.

78. Before the end of the school day on September 8, 2015, ATC received a call from a CPS school principal who advised that one of the special needs students who was left without a nurse had suffered a seizure. After that principal was advised to call 911, ATC received another call from a CPS school case manager trying to find out why no nurse was present for another special needs student who needed insulin.

Another principal called ATC complaining that special needs children in her school were without nurses.

79. Throughout the week of September 8, 2015, ATC received calls from confused parents who mistakenly thought the nurse their child had always known was scheduled to care for them on the first day of the 2015-16 school year, unaware of the ill-conceived plan by RCM and CPS to take over ATC's nurses or the fact that by cancelling the ATC contract just before school was scheduled to begin, CPS had effectively expelled the nurses RCM claimed it would "inherit."

80. Throughout the week of September 8, 2015, multiple calls were received from parents who stated that their children could not attend school because there was no nurse to care for them. Confused and worried school officials continued to contact ATC in an effort to obtain nurses – including a school principal faced with the prospect of an unattended student who was on dialysis – only to be told that ATC had no authority to send nurses to their aid and that they would have to contact CPS.

81. On September 9, 2015, a representative from Misericordia called ATC and stated that three of the children in their residential home who were supposed to be escorted to school by ATC nurses were left stranded, despite assurances from CPS that nurses would be there for the children on the first day of school. After the Misericordia representative was referred to CPS and assured nurses would arrive the following day, no one showed.

82. Although ATC was fully capable of providing nurses to all of the special needs students who were disenfranchised by CPS and RCM, the cancellation of the ATC contract left ATC unable to assist other than referring the school officials and parents to the CPS office or telling those faced with a medical emergency to call 911.

83. The pattern of RCM representatives soliciting ATC's employees as fully detailed herein was done deliberately, maliciously, and with the dual intent of eviscerating the existing employment agreements of ATC's employees and the remaining interest ATC had in its 2015-2016 contract extension.

84. The individual and collective actions of RCM and CPS as fully detailed herein, were in violation of the contractual obligations of CPS to ATC that provided for the services of ATC nurses to be paid *to ATC* and not funneled to RCM via the firing and subsequent re-hiring of the same nurses.

85. The individual and collective actions of RCM and CPS as fully detailed herein, were designed to, and did in fact, cause confusion as to who would ultimately provide nursing care for CPS disabled and special needs children, the means by which those services would be provided, and the ability of ATC employees to violate the terms of their existing employment contracts with ATC.

86. RCM, as the firm that was awarded a 30 million dollar, taxpayer-funded contract to provide nursing services to CPS, is now being paid for its efforts to recruit back to CPS the very same nurses that CPS has just inexplicably fired and is offering "bonuses" to lure back those same nurses.

87. At a time when CPS special needs children are being denied their right to nursing services in a manner which potentially threatens the rights of some of Chicago's most vulnerable students pursuant to 29 U.S.C. § 701 and/or their own individualized education programs, the actions of RCM and CPS have created an unfathomable scenario where children are being deprived of the nurses who cared for them and nurses are being deprived of the children they cared for.

**COUNT I:**
**VIOLATION OF THE ILLINOIS UNIFORM**
**DECEPTIVE TRADE PRACTICES ACT BY RCM AND CPS**

88. Plaintiff re-alleges Paragraphs 1-87 of this Complaint as fully set forth herein.

89. 815 ILCS 510/2(a) of the Illinois Deceptive Trade Practices Act provides, *inter alia*, that: A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person…(2) causes likelihood of confusion or of misunderstanding as to affiliation, connection, sponsorship, approval, or certification of goods and services; (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; (4) uses deceptive representations or designations of geographic origin in connection with goods or services; (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have…(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

90. 815 ILCS 510/1(5) of the Illinois Deceptive Trade Practices Act defines a "person" as "an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association…"

91. At a time when ATC had a legitimate interest in the continued employment and goodwill of its employees in the context of their work at CPS and/or other assignments for which they would otherwise be qualified, RCM representatives embarked on a course of conduct specifically designed to create the false impression that ATC employees were either free to work directly for RCM at CPS and/or they were required to do so and/or they already were under the control and or supervision of RCM and merely had to "confirm" they would be returning to work the following school year.

92. RCM further employed purposely deceptive methods in its communications as fully detailed herein in furtherance of its stated goal to "take over" the ATC nurses assigned to RCM.

93. The ability of RCM to engage in this conduct was directly and indirectly facilitated by CPS who provided RCM with personal information for ATC's employees with the specific intent that it would pay RCM to "recruit" the same highly skilled nurses it had just fired.

94. The ability of RCM to engage in this conduct was directly facilitated by CPS who augmented RCM's recruiting efforts with their own entreaties to parents that they had to intervene with their previously assigned ATC nurse to persuade them to work for RCM under threat that their disabled and special needs children would

face uncertainty as to who would provide for their care unless the ATC employees became RCM employees.

95. The ability of RCM to engage in this conduct was directly facilitated by CPS which went to great lengths to conceal from ATC the fact that it was actively working with RCM to engineer a takeover of ATC's nurses assigned to CPS in violation of the narrow provisions in the ATC/CPS contract that might have allowed them to do so.

96. The individual and collective actions of RCM and CPS as fully detailed herein, were purposefully deceptive and designed to evade the contractual obligations of CPS to ATC by allowing RCM to funnel the profits of the services of ATC employees while disenfranchising ATC of its right to be paid for those services to the detriment of disabled and special needs CPS students and the nurses who care for them.

97. The individual and collective actions of RCM and CPS as fully detailed herein, were purposefully deceptive, were designed to and did in fact cause, confusion as to who would ultimately provide nursing care for CPS disabled and special needs children, the means by which those services would be provided, and the ability of ATC employees to violate the terms of their existing employment contracts with ATC.

98. As a direct and proximate result of the acts of RCM, irreparable harm has been caused to ATC, including, but not limited to, loss of revenue, loss of productivity and damage to the employment relationships it had with more than 100 of its nurses and/or healthcare professionals.

WHEREFORE, Plaintiff ATC prays that judgment be entered in its favor and against Defendants RCM and CPS and that this Court enter an Order:

(1) prohibiting RCM from any and all contact with ATC's employees in violation of its existing agreements with those employees;

(2) enter an Order enjoining Defendant CPS from providing RCM and/or any third party further confidential information related to ATC employees;

(3) enter an Order enjoining Defendants CPS and RCM from any and all efforts to solicit, recruit, screen and/or employ any ATC employee previously assigned to CPS within the last year and/or subject to the restrictive covenants of ATC's employment agreement;

(4) enter an Order directing CPS to allow ATC's employees to return to their assignments within CPS for the remainder of the 2015-16 school term absent an event of default;

(5) enter an Order requiring that CPS take all necessary and reasonable measures to ensure that any disabled or special needs CPS students who were previously cared for by ATC nurses are allowed to remain with those nurses under the ATC contract for the 2015-16 school term;

(6) enter an Order awarding ATC costs and attorneys' fees incurred in this action and;

(9) awarding Plaintiff such other legal and equitable relief as the interests of justice may allow.

### COUNT II:
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT BY RCM

99. Plaintiff re-alleges Paragraphs 1-87 of this Complaint as fully set forth herein.

100.    815 ILCS 505/2 of the Illinois Consumer Fraud and Deceptive Business Practices

Act, provides, in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

101.    Claims brought by businesses who are not consumers of each other's products are specifically allowed under the Act in cases where the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.

102.    The individual and collective acts and practices of RCM as fully detailed herein included the use of deception, false pretense, misrepresentation, concealment, suppression and omission of material facts, with intent that others rely upon them, in addition to the violations by RCM of the Uniform Deceptive Trade Practices Act, as alleged.

103.    The conduct of RCM, individually and in cooperation with CPS, has demonstrably involved trade practices addressed to the market generally and otherwise implicates much larger consumer protection concerns for special needs students in the Chicago Public Schools and throughout Illinois.

WHEREFORE, Plaintiff ATC prays that judgment be entered in its favor and against Defendant CPS and that this Court enter an Order:

(1) awarding Plaintiff actual and punitive damages in an amount to be determined at trial pursuant to 815 ILCS 505/10(a);

(2) awarding Plaintiff reasonable attorneys' fees in the prosecution of this claim;

(3) awarding Plaintiff and further such relief as the interests of justice may allow.

### COUNT III:
### INTENTIONAL INTERFERENCE WITH PROSPECTIVE
### ECONOMIC ADVANTAGE AGAINST RCM AND CPS

104.    Plaintiff repeats and re-alleges Paragraphs 1-87 of this Complaint as if fully set forth herein.

105.    At all times relevant hereto, there existed between Plaintiff ATC and its employees assigned to CPS, business relationships of which Defendant RCM was aware.

106.    By virtue of the multiple attempts by RCM and CPS to solicit ATC employees to break their existing contractual relationship with ATC in violation of their own employment agreements and "take over" those employees under the RCM banner, RCM was well-aware of the fact that their efforts would result in irreparable injury to ATC.

107.    The multiple attempts by RCM and CPS to solicit ATC employees to break their existing contractual relationship with ATC in violation of their own employment

agreements and "take over" those employees under the RCM banner constitutes intentional and unjustified interference by the RCM and CPS.

108.    The multiple attempts by RCM to solicit ATC employees to break their existing contractual relationship with ATC in violation of their own employment agreements and "take over" those employees under the RCM banner caused actual damage to ATC and the children who attended CPS schools serviced by ATC.

WHEREFORE, Plaintiff ATC prays that judgment be entered in its favor and against Defendant CPS and that this Court enter an Order:

(1) of an award of damages, including compensatory and punitive damages where allowed by law;

(2) awarding ATC costs incurred in this action and;

(3) awarding Plaintiff such other legal and equitable relief as the interests of justice may allow.

## COUNT IV:
## INTENTIONAL INTERFERENCE WITH CONTRACT AGAINST RCM AND CPS

109.    Plaintiff repeats and re-alleges Paragraphs 1-87 of this Complaint as if fully set forth herein.

110.    At all times relevant hereto and as more fully set forth above, there existed between Plaintiff ATC and its employees assigned to CPS, employment contracts and restrictive covenants incorporated therein of which Defendant RCM was aware.

111.    By virtue of the multiple attempts by RCM to solicit ATC employees with more than two years of consecutive employment with ATC, urging to break their existing

contractual relationship with ATC in violation of their own employment agreements, RCM was well-aware of the fact that their efforts would result in irreparable injury to ATC.

112.    The multiple attempts by RCM to solicit ATC employees to break their existing contractual relationship with ATC in violation of their own employment agreements resulted in several ATC nurses breaching their contract with ATC and returning to their assignments within CPS under RCM, in violation of their employment agreements.

113.    The individual and collective actions of defendants as detailed herein constitute intentional and unjustified interference with ATC's employment contracts that were designed to, and in fact did cause, a breach of those contracts, that resulted in damages to ATC.

WHEREFORE, Plaintiff ATC prays that judgment be entered in its favor and against Defendants CPS and RCM and that this Court enter an Order:

(1) awarding damages, including compensatory and punitive damages where allowed by law;

(2) awarding ATC costs incurred in this action and;

(3) awarding Plaintiff such other legal and equitable relief as the interests of justice may allow.

## COUNT V:
## BREACH OF CONTRACT AGAINST CPS

114.    Plaintiff re-alleges Paragraphs 1-87 of this Complaint as fully set forth herein.

115.    At all times relevant hereto, there existed an implied covenant of good faith and fair dealing on the part of CPS in its conduct relative to the ATC contract and the 2014 extension thereof.

116.    Because the ATC/CPS contract specifically vests CPS with broad discretion in the performance of many of the terms of the, the covenant of good faith and fair dealing requires that this discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

117.    The terms of the 2010 services contract between ATC and CPS and the subsequent 2014 extension thereof, constitutes a valid, binding, and enforceable contract.

118.    The mutual assent of ATC and CPS to the terms of the 2010 services contract between ATC and CPS and the subsequent 2014 extension thereof created a legally binding obligation on the part of CPS to honor its obligations under the contract and pay ATC the guaranteed rates as provided.

119.    The mutual assent of ATC and CPS to the terms of the 2010 services contract between ATC and CPS and the subsequent 2014 extension thereof provided that a takeover of ATC nurses could only occur following an Event of Default by ATC as defined under the contract.

120.    Notwithstanding the above, Defendant CPS has specifically authorized and aided RCM in taking over management of the services of ATC nurses absent an Event of Default.

121.   In doing so, CPS has taken the position that the services of ATC employees should continue to be utilized, but the profits for those services will be diverted to RCM and the employees of ATC will now work for RCM, in violation of the existing ATC employment agreement of which CPS was well aware.

122.   This refusal on the part of Defendant CPS to abide by the terms of the 2010 services contract between ATC and CPS and the subsequent 2014 extension thereof constitutes a material breach of the contracts and is nothing more than a veiled attempt at undercutting the obligation of CPS to pay the guaranteed rates for ATC services by funneling the profits for those services to RCM as the "exclusive" service provider.

123.   As a direct and proximate result of Defendant's breach, Plaintiff ATC has suffered and will continue to suffer, harm of a personal and pecuniary nature which will be proven at trial.

WHEREFORE, Plaintiff ATC prays that judgment be entered in its favor and against Defendant CPS and that this Court enter an Order:

   (1) awarding compensatory Plaintiff damages to fully compensate for any failure of CPS to perform under the contracts, to the extent those damages are capable of being measured;

   (2) awarding Plaintiff costs incurred in this action;

   (2) awarding Plaintiff such other legal and equitable relief as the interests of justice may allow.

**PLAINTIFF demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b)**

**on all issues so triable.**

ATC HEALTHCARE, PLAINTIFF

By: __/s/ Lance Northcutt__
        Attorney for PLAINTIFF

Lance D. Northcutt, Esq.
**THE NORTHCUTT FIRM, P.C.**
1 East Wacker Drive, Suite 3800
Chicago, Illinois 60601
312.953.9252
lance@lnorthcuttlaw.com
#6278144

By: __/s/ Brian Coffman__
        Attorney for PLAINTIFF

Brian W. Coffman, Esq.
**COFFMAN LAW OFFICES, P.C.**
2615 North Sheffield Avenue #1
Chicago, Illinois 60601
(773) 348-1295
bcoffmanlaw@gmail.com