| | | |
|---|---|---|
| ATC HEALTHCARE SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 08020 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| RCM TECHNOLOGIES, INC. and | ) | |
| THE BOARD OF EDUCATION OF THE | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants RCM Technologies, Inc. and the Board of Education of the City of Chicago each move to dismiss ATC Healthcare Services, Inc.'s Complaint.[1] R. 19; R. 23.[2] For the reasons discussed below, both motions are granted, and the case is dismissed, although the dismissal is, for now, without prejudice to give ATC the opportunity to amend its Complaint.

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in the Complaint and draws all reasonable inferences in ATC's favor. *McGowan v. Hulick*, 612 F.3d 636, 637 (7th Cir. 2010). ATC Healthcare Services, Inc. is a

---

[1]The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332. The parties are completely diverse: ATC is headquartered in Georgia, with its principal place of business in New York; RCM Technologies is headquartered in New Jersey, with its principal place of business also in New Jersey; and the Board of Education of the City of Chicago is a citizen of Illinois. R. 1, Compl. ¶¶ 1-5. The amount in controversy alleged exceeds $75,000. *Id.* ¶ 6.

[2]Citations to the Court's docket are labeled as "R." followed by the docket number, and the applicable page or paragraph number.

Georgia-based staffing corporation that provides health care staffing needs to clients throughout the United States. R. 1, Compl. ¶ 1. In November 2006, ATC agreed to provide outsourced healthcare services to Chicago Public Schools (CPS), and more specifically, to provide nurses to work with disabled and special needs students attending CPS. *Id.* ¶¶ 8, 19-20. ATC's initial contract with CPS ran for two years, from November 1, 2006 to March 31, 2008. *Id.* ¶ 8. The terms of the contract gave the parties the option to extend the contract for an additional two years, which the parties exercised. *Id.* ¶¶ 8-9. After that renewal period ended, the parties signed a new contract in March 2010. *Id.* ¶ 9; R. 1, Exh. 1, 2010 Contract. This contract also gave the parties the option to extend the contract for an additional two years, but this time it allowed the parties to do so twice. Compl. ¶ 9; 2010 Contract at 8 (Section 5.2). All renewals were subject to the same terms and conditions as the original contract. Compl. ¶ 9; 2010 Contract at 8 (Section 5.2(a)). The parties chose to exercise both renewal options in the 2010 contract, agreeing to extend the contract in 2012 and again in 2014. Compl. ¶ 9. The final renewal period, which the parties agreed to in the 2014 extension, was to run from July 1, 2014 to June 30, 2016. *Id.* ¶ 10; R. 1, Exh. 2, 2014 Extension at 2.

The terms of the 2010 contract (and the later extensions) gave CPS significant discretion. Although the *rates* for ATC's services (that is, for the nurses it provided) were guaranteed under the terms of the contract, the contract did not guarantee ATC any actual service assignments. Compl. ¶ 10; 2010 Contract at 4 (Recitals "C"). CPS possessed "absolute discretion" in assigning students to ATC

and in modifying those assignments. 2010 Contract at 5 (Section 2.2). For its part, ATC had to accept CPS's assignments, unless it had a legitimate business reason for rejecting them, and ATC could not terminate an assignment without CPS's written approval. *Id.*; Compl. ¶ 12. The contract also gave CPS the ability to unilaterally regulate the services provided by the nurses assigned to CPS, Compl. ¶ 11, as well as the right to terminate the contract at any time so long as it gave ATC notice, 2010 Contract at 17 (Section 10.3). Under the contract, CPS also had several options in the "Event[] of [a] Default" by ATC, a defined term in the contract. 2010 Contract at 15 (Section 10.1). After giving ATC notice, CPS could (among other things) "[t]ake over and complete" the agreed-to services either "directly or through others," "[t]erminate th[e] Agreement[] in whole or in part," seek an "appropriate equitable remedy," seek "[m]oney damages," or withhold ATC's compensation. *Id.* at 15-16 (Section 10.2). In the absence of a default, however, neither party could assign the contract or any obligations imposed under it "without the prior written consent of the other party." *Id.* at 23 (Section 19).

All of the nurses hired by ATC and assigned to CPS were employees of ATC. Compl. ¶ 23. Each nurse was required to sign an employment agreement with ATC and was paid directly by ATC, not CPS. *Id.* While at CPS, the nurses provided vital services to disabled and special needs students, including providing "gastronomy tube feeding, tracheostomy care, ventilator care, medication through a nebulizer or other routes, assistance with range of motion and movement, the administration of medication, as well as urinary and bowel care." *Id.* ¶ 20. The nurses who worked

with CPS students were highly trained, and several were fluent in other languages (including sign language), which allowed them to work directly with ESL students and other special needs students. *Id.* ¶¶ 21-22.

As employees of ATC, the nurses were subject to the terms and conditions of their ATC Healthcare Employment Agreements. Compl. ¶ 24. Those Employment Agreements provided that the nurses were employees-at-will, and that they were employees of ATC, not of the patient, CPS, or any CPS-affiliates. *Id.* ¶ 25. The Employment Agreements also contained a provision prohibiting ATC employees from "[s]olicit[ing] or [a]ccept[ing] work from the Client":

> [ATC Employee] shall not directly, or indirectly, seek or accept employment or engage as an independent contractor by CPS or any affiliates. The waiting period for employment to CPS is 1 year following resignation from ATC.

*Id.* ¶ 26. Most ATC nurses assigned to CPS were long-term employees of ATC, with more than two years of successive employment with ATC. *Id.* ¶ 27. The nurses' Employment Agreements, however, were usually only for the school year, and had to be renewed each year. *Id.*

In November 2014, while ATC's contract with CPS was still in effect (remember, the 2014 extension agreement extended the contract through June 30, 2016), CPS decided to solicit new bids for its outsourced healthcare staffing needs, and issued a request for proposals. Compl. ¶ 31. ATC submitted a bid, as did about 10 other firms, including RCM Technologies. *Id.* ¶ 33. In RCM's bid, it highlighted "continuity" of care for CPS students as one of its primary goals, and proposed a scheme in which RCM would "take over" or "inherit" the existing nurses working at CPS, all of whom were employed by ATC or other agencies. *Id.* ¶¶ 34-36; R. 1, Exh.

4, RCM's Proposal to CPS at 21. RCM explained that "inheriting existing nurses is something [it] come[s] across on an annual basis," and that "[h]istorically, nurses approached by RCM have switched with considerable ease." Compl. ¶ 36; RCM's Proposal to CPS at 21. RCM further stated that it would use a "rigorous interview, screening and evaluation process" when selecting nurses for CPS, and that should RCM not be able to hire all the existing nurses assigned to CPS, RCM had over 100 nurses ready to staff the schools. Compl. ¶ 38; RCM's Proposal to CPS at 22.

According to ATC, shortly after the bids were submitted, CPS privately assured RCM that RCM would win the bid, and indeed CPS and RCM started colluding to execute RCM's scheme to take over the nurses assigned to CPS. Compl. ¶ 44. Publicly, however, CPS continued to postpone its final vote on the proposals. *Id.* In the meantime, unaware that CPS was colluding with RCM, ATC continued to recruit, train, and staff nurses in accordance with its still-effective 2014 contract extension. *Id.* ¶¶ 42, 45, 48. CPS also continued to use ATC's nurses and to participate in ATC's training programs, despite knowing (says ATC) that it intended to help RCM "dispossess" ATC of its staff and profits. *Id.* ¶¶ 43, 45, 48.

ATC alleges that around this same time, CPS officials took deliberate steps to make it seem as though CPS intended to continue working with ATC through the remainder of the 2014 contract extension period. Compl. ¶ 48. For example, in early June 2015 (still before any vote had occurred on the proposals), ATC submitted copies of its 2015-2016 employment agreements with its nurses to CPS for approval. *Id.* ¶ 49. CPS replied, "Thanks … This looks great," a response which gave ATC the

impression that CPS intended to use ATC's services for the 2015-2016 schoolyear. *Id.* CPS also asked ATC to provide a final list of all ATC nurse assignments, as well as a list of which nurses were assigned to which schools. *Id.* ¶ 50. ATC complied with CPS's request, providing CPS with the name, address, contact information, and school assignment(s) for each nurse, as well as a list of each nurse's student assignments. *Id.* ¶ 51.

On June 16, 2015, ATC received a call from CPS informing it—for the first time—that CPS would not be renewing ATC's contract after the 2015-2016 schoolyear. Compl. ¶ 52. The next day, ATC received a letter stating the same thing. *Id.* When ATC called CPS to ask why its proposal was not accepted, and in particular, why CPS decided to change the students' caregivers when ATC had a strong track record of success, CPS officials refused to provide any answers, simply stating that a committee of six Board members had decided not to award ATC the next contract. *Id.* ¶¶ 54-55. According to ATC, CPS did not give ATC any indication that it intended to help RCM take over ATC's nurses for the current schoolyear. *Id.* In fact, a few days later, on June 18, 2015, CPS was still requesting new nursing assignments from ATC. *Id.* ¶ 58.

On June 24, 2015, the CPS Board finally voted to approve RCM's bid. Compl. ¶ 59. Two days later, on June 26, 2015, CPS informed ATC that none of its nurses would be needed for the summer. *Id.* CPS did not, however, terminate ATC's contract; that still remained in effect. *Id.* ¶ 62. In the meantime, CPS provided RCM with a complete list of all ATC employees working in CPS schools, as well as each

ATC employees' contact information. *Id.* ¶ 61. Despite not having a formal contract with CPS in place, RCM immediately began "aggressively soliciting" ATC's nurses—and in particular, those nurses who had worked at CPS for several years—and offering them "exclusive" positions at CPS. *Id.* ¶¶ 62-63. RCM told several of ATC's employees that RCM would be "taking over" their contracts, and that they had to now work for RCM. *Id.* ¶ 63. Allegedly, CPS soon joined in RCM's recruiting efforts, calling ATC nurses directly and encouraging them to contact RCM in order to keep their assignments at CPS. *Id.* ¶ 64. CPS even contacted parents of students to inform them that in order for their child to continue seeing the same nurses, the nurses would need to work for RCM. *Id.*

As the 2015-2016 schoolyear drew closer, RCM's overtures to ATC's nurses grew increasingly more urgent and deceptive. Compl. ¶ 65. For example, RCM sent solicitations implying that ATC employees were already working for RCM, and that they merely had to "confirm" that they wished to return to their previous CPS assignments. *Id.* ¶¶ 65-66. RCM even went so far as to send emails marked "urgent" that told nurses they needed to be fingerprinted (something the nurses had already done) and to contact RCM immediately. *Id.* ¶ 67. RCM also offered ATC nurses referral bonuses if they would help reach out to other nurses. *Id.* ¶ 70. According to ATC, all of these efforts were a ruse designed by RCM to create the false impression that ATC's nurses were now required to report to RCM, despite the fact that they were still ATC employees. *Id.* ¶ 68. ATC contends that this led to confusion among the nurses, many of whom did not understand why they were being contacted by

RCM or why they would need to be fingerprinted again. *Id.* ¶ 69. Meanwhile, CPS maintained that it was reserving its rights under the ATC contract and that ATC might still be called upon to provide nurses for the 2015-2016 schoolyear. *Id.* ¶ 71.

On August 13, 2015, a little over two weeks before the 2015-2016 schoolyear was scheduled to start, CPS notified ATC for the first time that it was terminating their contract. Compl. ¶ 73. At the same time, RCM continued reaching out to ATC's nurses in a deceptive manner, trying to "schedule" the nurses in their previous assignments despite the fact that RCM had never interviewed, screened, or hired these nurses. *Id.* ¶ 74. RCM also tried to deceive ATC's nurses into believing that RCM's efforts were either permissible or ratified by ATC. *Id.* ¶ 75. This apparently led to more confusion, with many nurses contacting ATC to ask why they were being "scheduled" by RCM when they had never applied to RCM and still worked for ATC. *Id.*

When the first day of school arrived in early September 2015, "scores" of special-needs students were denied nursing services and unable to attend classes. Compl. ¶ 76. Throughout that first week, ATC was "inundated" with calls from school principals and case managers who were "irate" that nurses had failed to show up at school. *Id.* ¶ 77. According to ATC, those CPS employees were under the mistaken belief that the same ATC nurses who had served the students previously would be available to return for the first day of school. *Id.* ATC informed them that it had no authority to send nurses to their aid because CPS canceled its contract. *Id.* ¶ 80. Throughout that week, ATC also apparently received calls from confused

parents, who did not understand why their children were left without nurses. *Id.* ¶¶ 79-80.

According to ATC, RCM's accepted bid was nothing more than an agreement between RCM and CPS to allow RCM to take over ATC's role and manage the services provided by ATC. Compl. ¶ 40. ATC alleges that this attempted takeover by RCM and CPS not only violated ATC's contract with CPS, which only allowed CPS to "take over" ATC's nurses in the event of a default, but it also violated ATC's Employment Agreements with its nurses, which contained non-compete clauses. *Id.* ¶¶40, 43-84.

Relying on the allegations discussed above, ATC filed this lawsuit against CPS and RCM, asserting several claims for relief. First, ATC alleges that both CPS and RCM violated the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510 *et seq.* Compl. ¶¶ 88-98 (Count 1). Second, ATC alleges that RCM violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et seq.* *Id.* ¶¶ 99-103 (Count 2). Next, ATC alleges that both CPS and RCM tortiously interfered with ATC's prospective economic advantage with its nurses, and that they tortiously interfered with ATC's Employment Agreements with its nurses. *Id.* ¶¶ 104-113 (Counts 3 and 4). Finally, ATC alleges that CPS breached its 2014 extension agreement with ATC. *Id.* ¶¶ 114-123 (Count 5). Both CPS and RCM now move to dismiss all counts against them under Federal Rule of Civil Procedure 12(b)(6). R. 19, CPS's Mot. to Dismiss; R. 23, RCM's Mot. to Dismiss.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *McGowan v. Hulick*, 612 F.3d 636, 637 (7th Cir. 2010) (courts must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are

factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679; *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

### III. Analysis

### A. Count 1: Illinois Uniform Deceptive Trade Practices Act
### (Against CPS and RCM)

In Count 1, ATC alleges that CPS and RCM's attempted takeover of ATC's nurses violated five sections of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2(a). Compl. ¶¶ 88-98. The purpose of the Deceptive Trade Practices Act is to "enjoin[] … trade practices which confuse or deceive the consumer." *Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1156 (Ill. App. Ct. 1992); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1035 (N.D. Ill. 2003). The Act provides in pertinent part: "A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: …

> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods and services;
>
> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;
>
> (4) uses deceptive representations or designations of geographic origin in connection with goods or services;
>
> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; …
>
> (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

815 ILCS 510/2(a); Compl. ¶ 89. ATC alleges that CPS and RCM violated these sections. But the allegations do not state a claim under the Act.

First, for there to be a violation of the Act, a defendant must make some form of communication to the public regarding the plaintiff's services that is "false, misleading, or deceptive." *Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 147 (N.D. Ill. 1997); *Associated Underwriters of Am. Agency, Inc. v. McCarthy*, 826 N.E.2d 1160, 1169 (Ill. App. Ct. 2005). Put another way, the defendant must "disparage[] the services or business of another [through] a false or misleading representation of fact." *Associated Underwriters of Am. Agency, Inc.*, 826 N.E.2d at 1169. *See also McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1173 n.9 (7th Cir. 1986) (noting that the Act codifies the common-law tort of unfair competition); *Crinkley v. Dow Jones & Co.*, 385 N.E.2d 714, 719 (Ill. App. Ct. 1978). Here, none of the alleged communications by RCM (that were supposedly facilitated by CPS) *disparaged* ATC's services. RCM's solicitations did not misrepresent ATC's services; they did not suggest that RCM had an affiliation or sponsorship as to its services that it did not, or that RCM's services had a particular geographic origin or benefit. RCM also never explicitly stated or implied in its solicitations that ATC's services were somehow of poor quality or of little value. Rather, all that RCM attempted to do through its solicitations was convince ATC's nurses to leave ATC and join RCM. These solicitations do not fall within the purview of any of the Act's sections identified by ATC.

ATC has also failed to sufficiently allege the existence of a "likelihood of confusion." Essential to maintaining an action under the Deceptive Trade Practices Act are allegations of a "likelihood of confusion." *Hooker v. Columbia Pictures*

*Indus., Inc.*, 551 F. Supp. 1060, 1064 (N.D. Ill. 1982). ATC has failed to adequately allege this element. To be sure, ATC does allege that CPS and RCM created confusion in certain ways: "[The] actions of CPS and RCM … were designed to and did in fact cause, confusion as to who would ultimately provide nursing care for CPS [children], … the means by which those services would be provided, and the ability of ATC employees to violate the terms of their existing employment contracts with ATC." Compl. ¶ 97. But, as explained next, these allegations fail to describe the type of confusion that the Act actually targets.

"Likelihood of confusion" under the Deceptive Trade Practices Act has the same meaning as it does in trademark infringement cases. *See McGraw-Edison Co.*, 787 F.2d at 1174; *Rock-A-Bye Baby, Inc. v. Dex Prods., Inc.*, 867 F. Supp. 703, 713 (N.D. Ill. 1994). In trademark infringement cases, "'likelihood of confusion' exists when the defendant's use of a deceptive trade name, trademark, or other distinctive symbol is likely to confuse or mislead consumers as to the source or origin of the product or service." *Hooker*, 551 F. Supp. at 1064 (citing J. Gilson, *Trademark Protection and Practice* § 5.01 (1982)). To avoid any confusion, , a seller need only identify his or her product or service in such a way that "purchasers exercising ordinary care to discover whose products they are buying will know the truth and not become confused or mistaken." *Id.* (citing *Dave Grossman Designs, Inc. v. Bortin*, 1973 WL 20395, at *5 (N.D. Ill. Jan. 8, 1973)). *See also Fruit Growers Co-op. v. M.W. Miller & Co.*, 170 F.2d 834, 837 (7th Cir. 1948).

Viewing the allegations in light of this definition, the Court concludes that ATC fails to state a claim under the Act. Even taking ATC's allegations as true, they do not allege the type of marketplace confusion contemplated by the Act. Although it is true that ATC and RCM offer the same type of services—both provide healthcare staffing services, Compl. ¶¶ 3-4, 8—ATC does not allege that RCM's actions ever caused confusion about which company was which. Nor does ATC allege that RCM ever tried to pass off its services as those of ATC. While ATC's nurses may have been confused as to why RCM was contacting them, ATC's allegations do not indicate that its nurses were ever confused as to *which company* was contacting them. *Id.* ¶ 69 (alleging that "several ATC nurses … expressed confusion as to why they were being contacted by RCM"); *id.* ¶ 75 (alleging that "nurses contacted ATC and expressed confusion as to why they were being 'scheduled' by RCM when they had never applied for RCM and still worked for ATC"). Nor do ATC's allegations suggest that any students, parents, or CPS employees were ever confused as to which company was which. Sure, they may have been confused as to why they had no nursing services at the start of the 2015-2016 schoolyear, but they never mistook RCM for ATC. *Id.* ¶¶ 77-79.

Because ATC's allegations do not fall within the purview of the sections of the Illinois Uniform Deceptive Trade Practices Act relied on by ATC, or sufficiently allege a likelihood of confusion as that term is used under the Act, ATC has failed to state a claim under the Act. Count 1 is dismissed in its entirety.[3]

---

[3]CPS separately argues that ATC's allegations under this Count should be subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). R. 19, CPS's

## B. Count 2: Illinois Consumer Fraud and Deceptive Business Practices Act (Against RCM Only)

In Count 2, ATC alleges that RCM violated Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act by using deceptive and misleading practices to try to take over ATC's nurses.[4] 815 ILCS 505/2; Compl. ¶¶ 99-103. RCM contends that ATC's allegations are insufficient to state a claim under the Act. The Court agrees.

"The Consumer Fraud Act is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). To state a claim under the Act, a plaintiff must allege: "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during a course of conduct involving trade or commerce." *Id.*; *Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010). A plaintiff must also allege that he or she suffered actual damage that was proximately caused by the deceptive act. *Philadelphia Indem. Ins. Co.*, 771 F.3d at 402; *Geschke v. Air Force*

---

Mot. to Dismiss at 7. But CPS's reliance on Rule 9(b) is misplaced, as ATC's claims are based on "likelihood of confusion" and not fraud. *See Dynamic Fluid Control (PTY) Ltd. v. Int'l Valve Mfg., LLC*, 790 F. Supp. 2d 732, 738 (N.D. Ill. 2001). Regardless, it does not matter whether a heightened pleading standard applies to this Count because, as discussed above, ATC's claim fails even under Rule 8's lower pleading standard.

[4]Although ATC brings this claim against just RCM, in ATC's prayer for relief related to this Count ATC references CPS as well RCM. Compl. ¶ 103. ATC, however, has clarified that this reference to CPS was a mistake and that it brings this Count against RCM only. R. 27, ATC's Resp. Br. to CPS's Mot. to Dismiss at 4 n.1.

*Ass'n*, 425 F.3d 337, 345 (7th Cir. 2005); *see also Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 850 (Ill. 2005). If claims under the Act assert fraud, they must be pled with particularity. *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 720 F. Supp. 2d 978, 1004 (N.D. Ill. 2010); Fed. R. Civ. P. 9(b). But if they allege only unfair conduct, then they are subject to the pleading standards of Rule 8. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011).

Although "the Consumer Fraud Act is primarily concerned with protecting consumers," *see Indus. Specialty Chem., Inc. v. Cummins Engine Co., Inc.*, 902 F. Supp. 805, 811 (N.D. Ill 1995), businesses (like ATC) are able to sue other businesses under the Act in two instances. First, a business may bring suit under the Act when it is the consumer. *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 777 (N.D. Ill. 2008); *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1368 (N.D. Ill. 1996); *Freedom Mortg. Corp.*, 720 F. Supp. 2d at 1004. The Act defines a "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e). Here, ATC is not a consumer of RCM's services; to the contrary, they are direct competitors. So, ATC cannot bring suit in this way.

Second, non-consumer businesses are able to sue other businesses under the Act if they are able to allege that the challenged conduct "involves trade practices addressed to the market generally or otherwise implicates consumer protection

concerns." *Indus. Specialty Chem., Inc.*, 902 F. Supp. at 812 (internal quotation marks omitted); *Freedom Mortg. Corp.*, 720 F. Supp. 2d at 1004; *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 41 (Ill. App. Ct. 1989). *See also Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 437 (7th Cir. 1996). Although ATC attempts to make allegations to this effect in its Complaint, its allegations once again fall short.

ATC alleges that the deceptive tactics used by RCM to solicit ATC's nurses "implicate[] much larger consumer protection concerns for special needs students in the Chicago Public Schools and throughout Illinois." Compl. ¶ 103. But this broad, conclusory statement is insufficient to state a claim. ATC does not allege that RCM's deceptive acts were ever directed toward the students or the general marketplace, or that they were designed to deceive CPS (which is actually more like an alleged co-schemer) or CPS's students, the actual consumers of ATC and RCM's services. ATC alleges only that RCM's solicitations were sent to and designed to deceive ATC's nurses. *Cf. Gold v. Golden G.T., LLC*, 2005 WL 2465815, at *4 (N.D. Ill. Oct. 4, 2005) (explaining that the consumer nexus requirement may be satisfied by showing that the alleged deception was "directed to 'consumers,' as opposed to simply 'customers' of the business plaintiff"); *Pain Prevention Lab, Inc. v. Elec. Waveform Labs, Inc.*, 657 F. Supp. 1486, 1493 (N.D. Ill. 1987) (allegations sufficient to state a claim where plaintiff alleged that defendant made misrepresentations "in the marketplace and to actual and/or prospective customers"). *See also Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 912 (N.D. Ill. 2012) (allegations

insufficient where plaintiff "fail[ed] to allege that the letters and written notices she received concerned anyone other than her or that Defendants made misrepresentations to the general public"); *Conditioned Ocular Enhancement, Inc. v. Bonaventura*, 458 F. Supp. 2d 704, 711 (N.D. Ill. 2006) (allegations insufficient where plaintiff alleged that defendant had sent letters to seven of the plaintiff's customers as the letters were not directed to the marketplace generally).

ATC also fails to provide any detail on the broader consumer protection concerns that are supposedly at play here; the single conclusory allegation provided by ATC in conjunction with this Count in the Complaint is not enough. *Cf. Downers Grove Volkswagen, Inc.*, 546 N.E.2d at 41 (plaintiff's contention that defendant circulated deceptive pamphlets to consumers sufficiently "implicate[d] consumer-protection concerns"). ATC does suggest elsewhere in the Complaint that a few students faced medical emergencies during the first week of the 2015-2016 schoolyear due to a lack of nurses. Compl. ¶¶ 76-81, 87. As troubling and serious as those allegations are, ATC fails to establish a link between RCM's allegedly improper solicitations—which, again, were directed at the nurses—and the emergencies. What's more, none of RCM's solicitations were ever directed toward the students, so none of its solicitations could have raised consumer protection concerns on the ground that they were likely to mislead or confuse consumers. *Ohio Nat'l Life Assur. Corp. v. Davis*, 2010 WL 3806487, at *2 (N.D. Ill. Sept. 27, 2010) ("Nor does [defendant's] conduct implicate consumer protection concerns, which includes conduct that could mislead or confuse consumers."). Without more, ATC

has failed to allege that RCM's actions implicated broader consumer protection concerns. Accordingly, RCM's motion to dismiss Count 2 is granted.

### C. Tortious Interference with Prospective Economic Advantage (CPS and RCM)

In Count 3, ATC alleges that both CPS and RCM tortiously interfered with its prospective economic advantage by soliciting (or in CPS's case, helping to solicit) ATC's nurses to break their existing contractual relationship with ATC. Compl. ¶¶ 104-08. This Illinois common-law tort has four elements: (1) the plaintiff must have a reasonable expectancy of a valid business relationship with a third party; (2) the defendant must know about it; (3) and intentionally interfere with that expectancy so as to prevent it from ripening into a valid business relationship; and (4) the interference must injure the plaintiff. *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991); *Lynch Ford, Inc. v. Ford Motor Co., Inc.*, 957 F. Supp. 142, 145-46 (N.D. Ill. 1997).

Here, ATC has sufficiently alleged the first two elements. ATC did have a reasonable expectancy of a future business relationship with its nurses. All of its nurses worked directly for ATC, not for CPS, and were employed at-will pursuant to their ATC Employment Agreements. Compl. ¶¶ 23-27. Many had also worked for ATC for several years. *Id*. "[I]n Illinois there is a rebuttable presumption that at-will employment will continue as long as both parties desire that the economic relationship remain in place." *Ali v. Shaw*, 481 F.3d 942, 944-45 (7th Cir. 2007); *Cashman v. Shinn*, 441 N.E.2d 940, 944 (Ill. 1982). Neither RCM nor CPS has given the Court any reason to question this presumption. And when reasonable inferences

are given to the allegations, CPS and RCM can be considered to be on notice that ATC reasonably expected that its nurses would continue employment with ATC. So, ATC has adequately alleged an expected business relationship with its nurses, and that RCM and CPS knew about it.

But the problem for ATC is that it has failed to allege that it was damaged by RCM's solicitations. To prevail on this claim, ATC must also ultimately show that RCM and CPS "succeeded in ending [its] relationship [with its nurses] or [in] interfering with [ATC's] expectancy." *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998). ATC has failed to allege this, even at the dismissal-motion stage. ATC alleges in a conclusory manner that RCM and CPS's efforts to solicit ATC's nurses "result[ed] in irreparable injury to ATC," Compl. ¶ 106, and that "[t]he multiple attempts by RCM to solicit ATC employees … caused actual damage to ATC and the children who attended CPS schools," *id.* ¶ 108. But these blanket assertions are insufficient to state a claim against either RCM or CPS. Without some *factual* allegation (as distinct from conclusions) that ATC was actually damaged by RCM and CPS's solicitation efforts (such as allegations that nurses actually left ATC or that ATC could not fill other positions for other clients because of leaving nurses), ATC has failed to state a claim. ATC need not identify all of the nurses with whom it had a relationship, or the names of any nurses who left ATC because of RCM's efforts, *Lawson Prods., Inc. v. Chromate Indus. Corp.*, 158 F. Supp. 2d 860, 866 (N.D. Ill. 2001), but ATC does need to allege some specific *facts*

demonstrating that it was harmed by RCM's solicitation efforts.[5] It has failed to do this.

Finally, it is worth noting that in any event, the Court probably would have dismissed this claim due to the competitor's privilege. RCM's Br. at 12-13. Generally, a company may try to take a competitor's employees if it can do so without inducing a breach of contract. *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999); *Gen. Motors Corp. v. State Motor Vehicle Review Bd.*, 862 N.E.2d 209, 220 (Ill. 2007); *see also Flexicorps, Inc. v. Trend Tech., Inc.*, 2002 WL 31018353, at *8-9 (N.D. Ill. Sept. 10, 2009). Hiring a competitor's employees is an ordinary part of competition, and indeed is inherent in any successful economic system. *Speakers of Sport, Inc.*, 178 F.3d at 865; *Dames & Moore v. Baxter & Woodman, Inc.*, 21 F. Supp. 2d 817, 826 (N.D. Ill. 1998) ("There is no question that a corporation may generally compete for the at-will employees of a rival."). To be sure, this defense "does not excuse bad faith or malicious action." *Lawson Prods., Inc.* 158 F. Supp. 2d at 866; *Candalaus Chicago, Inc. v. Evans Mill Supply Co.*, 366 N.E.2d 319, 326-27 (Ill. App. Ct. 1977). A company's efforts must be done at least in part to

---

[5]RCM suggest in its briefing that ATC is required to identify the specific nurses with whom ATC had an expected business relationship. R. 24, RCM's Br. at 14-15. But RCM misunderstands the pleading requirements for this tort. ATC need only identify who the third party is; it need not specifically name the third party. *See Celex Group, Inc. v. Exec. Gallery, Inc.*, 877 F. Supp. 1114, 1125 (N.D. Ill. 1995); *Downers Grove Volkswagen, Inc.*, 546 N.E.2d at 37 (explaining that under this tort, a plaintiff need only show a business relationship with a "specific third part[y] or an identifiable prospective class of third persons," plaintiff is not required to "allege the identity of the third party or parties by name"). ATC has satisfied this requirement by alleging that it had an expected business relationship with its nurses (the third party). Nothing more is required at this stage of the litigation.

further its own business interests, and not solely out of spite or ill-will. *Id.*; *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 8 (Ill. App. Ct. 1995).

Here, RCM's solicitation efforts were no doubt done in part to further its own business interests. One of the key things RCM highlighted in its bid to CPS was its goal of providing continuity of care to CPS's students. RCM's Proposal to CPS at 21. In conjunction with this goal, RCM highlighted its past success in inheriting nurses from other agencies. *Id.* ("Our priority and goal is to ensure continuity for the children[.] … [RCM] has taken over many contracts from other vendors in many of the nation's largest school systems, some of which include Philadelphia & Hawaii."). Given CPS's decision to award the contract to RCM (as opposed to any other service provider), and its willingness to provide RCM with the names of those nurses currently assigned to CPS, presumably, RCM's strategy contributed to its success in winning the CPS bid. So, RCM's efforts were certainly done at least in part to further its own interests.

But there is no allegation that RCM's actions were done out of spite or ill-will toward ATC, at least not in the sense of spite or ill-will that is relevant to this common-law tort. ATC makes no allegations along these lines. ATC does suggest that CPS should not have given RCM its nurses' contact information, Compl. ¶¶ 17, 61, but as will be discussed in more detail below, *see infra* Section III.E, CPS had no obligation under the terms of the 2010 contract to keep that information private. So there is no basis to allege that RCM used wrongfully obtained confidential information to solicit ATC's nurses. *Cf. Lawson Prods., Inc.*, 158 F. Supp. 2d at 866

(holding that using wrongfully obtained confidential information shows bad faith). There is also no other allegation that RCM otherwise acted in bad faith. ATC does contend that RCM improperly attempted to induce its nurses to breach the non-compete agreements in their contracts, Compl. ¶¶ 106-08, but as is discussed next, those non-compete provisions are invalid. *Infra* Section III.D. Accordingly, RCM has a strong competitor's privilege defense in this case.

Because ATC has failed to state a claim against either RCM or CPS for tortious inference with prospective economic advantage, this Count is dismissed.[6]

### D. Count 4: Tortious Interference with Contract (Against CPS and RCM)

Next, ATC alleges that CPS and RCM tortiously interfered with ATC's employment contracts with its nurses by trying to solicit ATC's nurses to join RCM. Compl. ¶¶ 109-113. For this claim, ATC must allege: (1) the existence of a valid contract between it and another; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of a breach of the contract; (4) an actual breach of the contract; and (5) damages. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989); *Cody v. Harris*, 409 F.3d

---

[6]The parties also discuss in conjunction with this Count the fact that ATC may have lost its contract with CPS because of RCM's takeover strategy, *see* RCM's Br. at 14; CPS's Mot. to Dismiss at 9-13; R. 28, ATC's Resp. Br. to RCM's Mot. to Dismiss at 6, but this fact does not save ATC's claim for several reasons. First, ATC had no reasonable expectancy of a continued business relationship with CPS. The contract gave CPS broad discretion to give ATC as much, or as little work, as CPS desired. 2010 Contract at 4-5. It also gave CPS the right to terminate the contract at any time so long as CPS provided ATC with notice, which it did. *Id.* at 17. Second, ATC cannot show any damages from CPS's decision to give RCM the next contract or its decision not to employ any of ATC's nurses, because neither action constituted a breach of the 2010 Contract. Finally, a contracting party like CPS generally cannot be liable in tort for inducing a breach of contract. *See Rao v. Rao*, 718 F.2d 219, 225 (7th Cir. 1983).

853, 859 (7th Cir. 2005); *Leonel & Noel Corp. v. Cerveceria Centro Americana, S.A.*, 758 F. Supp. 2d 596, 606 (N.D. Ill. 2010).

ATC's first problem is that all of its employment contracts with its nurses are terminable at-will. Compl. ¶ 25. Under Illinois law, inducing a third party to cancel an at-will contract does not result in a breach of contract. *See Cody*, 409 F.3d at 859; *Canel and Hale, Ltd v. Tobin*, 710 N.E.2d 861, 870-71 (Ill. App. Ct. 1999). At most, it can lead to a claim of tortious interference with a plaintiff's prospective economic advantage (a claim which ATC separately brought and the Court already discussed and rejected), but not a claim of interference with a plaintiff's contractual relations. *Cody*, 409 F.3d at 859; *Prudential Ins. Co. of Am. v. Sipula*, 776 F.2d 157, 162 (7th Cir. 1985); *Buckley v. Peak6 Invs., LP*, 827 F. Supp. 2d 846, 852 (N.D. Ill. 2011).

There is one wrinkle, however, which the Court alluded to above. All of ATC's employment contracts with its nurses contain a non-compete clause, which ATC alleges prevented each of its nurses from working for RCM for one year following the nurse's termination from ATC. *E.g.*, R. 1, Exh. 3, Sample ATC Employment Contract at 5; *see also* Compl. ¶¶ 26, 112; ATC's Resp. Br. to CPS's Mot. to Dismiss at 11. ATC contends that both CPS and RCM knew about this provision. Compl. ¶ 28 ("The employment agreement for each ATC employee assigned to CPS was, as a matter of routine practice within ATC, reviewed and approved by CPS."); *id.* ¶ 110 ("[T]here existed between Plaintiff ATC and its employees assigned to CPS, employment contracts and restrictive covenants incorporated therein of which Defendant RCM was aware."). If true (which the Court must assume at this stage),

then it is possible that ATC could adequately allege a breach of contract, despite the contracts being terminable at-will, by alleging that RCM and CPS intentionally tried to induce the nurses to violate the non-compete provisions in their contracts.

But in order for such a breach to be possible, the non-compete clauses would need to be valid; the clauses would also need to be interpreted in the way that ATC contends, as precluding the nurses from working for RCM. It is here that ATC again runs into trouble. As an initial matter, there is some discrepancy in the record as to the particular language used in the non-compete provisions. In the Complaint, ATC alleges that the nurses' non-compete clauses stated: "[Employee] shall not directly, or indirectly, seek or accept employment by or engage as an independent contractor *by CPS or any affiliates* … [for] 1 year following resignation from ATC." Compl. ¶ 26 (emphasis added). But some of the sample employment contracts that ATC attached to the Complaint use slightly different language: "[Employee] shall not, directly or indirectly, seek or accept employment by, or engagement as an independent contractor *by any client* to which [Employee] is assigned by ATC for a period of one (1) year following the last date of his or her most recent assignment to such client without [ATC's] written consent." Sample ATC Employment Contract at 5, 18, 28 (emphasis added). Others use the same language as in the Complaint. *Id.* at 14. Still others appear not to contain a non-compete provision at all. *Id.* at 30-34, 35-39. For purposes of this motion, the Court assumes that the nurses' employment agreements included a non-compete clause, and that they included language similar to that in the Complaint (that is, prohibiting a nurse from working for "CPS or any

affiliates"), which is the only language broad enough to potentially include RCM, because RCM was never ATC's "client."

RCM contends that even under this broader language, no breach could occur because RCM is not an "affiliate" of CPS. RCM's Br. at 5-6. According to RCM, the language of the non-compete clause only precludes a nurse from working for an ATC client or a client's affiliate; it does not preclude a nurse from working for one of ATC's competitors. *Id.* at 6. At this stage of the litigation, however, it cannot be determined whether RCM qualifies as a CPS "affiliate." To answer that, discovery is needed, because the term "affiliates" is neither defined in the sample contracts provided by ATC nor in the Complaint. In arguing that the non-compete provisions cover RCM, ATC places significant emphasis on the term "indirectly." ATC's Resp. Br. at RCM's Mot. to Dismiss at 8. But this is not the key term. The most reasonable reading of the term "indirectly" is as a modification to the "seeking of employment" phrase, that is, it indicates that a nurse may not directly *or indirectly* seek or accept employment from CPS or one of CPS's affiliates. ATC's suggestion that the term "indirectly" indicates that a nurse may not work "indirectly" as an "independent contractor" for a CPS affiliate relies on an unnatural reading of the provision. *Id.* It is the fact that the term "affiliates" could potentially be broad enough to cover RCM that this clause plays a role in this case.[7]

_____

[7]Although the Court does not decide at this time whether RCM is a CPS affiliate, the Court does note that ATC would likely have a difficult time proving this fact. It is well settled in Illinois that restrictive covenants, including non-compete clauses, are construed against the drafters. *Crest Comm., Inc. v. Union-Hall, Inc.*, 243 N.E.2d 652, 656 (Ill. App. Ct. 1968) ("[A]s a general rule restrictive covenants are strictly construed and all doubts must be resolved in favor of natural rights and against restriction[.]"); *Southwest Forest*

That being said, the nurses' non-compete clauses still do not save ATC's tortious inference of contract claim, because even assuming that RCM is an affiliate of CPS, the non-compete clauses fail for lack of a legitimate business interest.[8] For a non-compete clause to be valid and enforceable, its terms must be reasonable and necessary to protect an employer's legitimate business interests. *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396-97 (Ill. 2011). The terms (1) must not be greater than necessary to protect the employer's legitimate business interest, (2) must not impose an undue hardship on the employee, and (3) must not injure the public. *Id.* at 396; *Liautaud v. Liautaud*, 221 F.3d 981, 987 (7th Cir. 2000). Whether a covenant is reasonable is a question of law, *Liautaud*, 221 F.3d at 986, and whether an employer has a legitimate business interest turns on "the totality of the facts and circumstances of the individual case," *Reliable Fire Equip. Co.*, 965 N.E.2d

_____

*Indus., Inc. v. Sharfstein*, 482 F.2d 915, 919 (7th Cir. 1972). Because the term "affiliates" is not defined in ATC's employment contracts, RCM would have a strong argument against interpreting the term to include ATC's competitors.

[8]RCM separately argues that ATC's non-compete clauses fail for want of consideration. RCM's Br. at 6. For a post-employment non-compete clause to be enforceable in Illinois, it must be supported by adequate consideration, which requires that the employee have been employed for a substantial period of time following the execution of the non-compete provision. *Lawrence and Allen, Inc. v. Cambridge Human Res. Grp., Inc.*, 685 N.E.2d 434, 440-41 (Ill. App. Ct. 1997); *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 715 (N.D. Ill. 2014). RCM contends that Illinois courts require two years or more of successive employment following the execution of the covenant for there to be adequate consideration. RCM's Br. at 6-7. Because none of ATC's nurses worked for ATC for more than one year, RCM argues, the covenants are not enforceable. *Id.* at 7-8. But Illinois law is not quite so clear. While some Illinois courts have held that two years of continued employment is required for there to be adequate consideration, *e.g.*, *Fifield v. Premier Dealer Servs., Inc.*, 993 N.E.2d 938, 943 (Ill. App. Ct. 2013), others have suggested that "[f]actors other than the time period of the continued employment" must be considered, *e.g.*, *Woodfield Grp., Inc. v. DeLisle*, 693 N.E.2d 464, 469 (Ill. App. Ct. 1998); *McRand, Inc. v. van Beelen*, 486 N.E.2d 1306, 1314 (Ill. App. Ct. 1985). *See also Montel Aetnastak, Inc.*, 998 F. Supp. 2d at 716. The Court need not determine whether adequate consideration exists in this case, however, because even assuming it does, ATC's non-compete clauses fail on alternative grounds, as discussed below.

at 403. Despite the need to examine the totality of the circumstances, there are certain factors that can help guide a court's analysis as to whether a legitimate business interest exists, including, "the near-permanence of [the employer's] customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.*

Here, ATC has failed to allege that it had a legitimate, protectable interest in restricting its nurses from working for a competitor like RCM. First, ATC lacks a near-permanent relationship with its customers. ATC's business of providing outsourced staffing services to other companies and businesses is simply not a business that "engender[s] customer loyalty." *Lawrence and Allen, Inc.*, 685 N.E.2d at 444. It is not uncommon for "customers [to rely on] many [staffing agencies] simultaneously to meet their needs," or to switch between staffing agencies fairly regularly, as the industry is highly competitive and the services offered by agencies easily matched. *Id.*; *see also Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1012 (N.D. Ill. 2014) (concluding that customers were not near-permanent in highly competitive IT staffing industry). ATC's relationship with CPS provides a perfect example. Although ATC had a contract with CPS to provide nursing services, the contract did not guarantee ATC any business from CPS, nor did it preclude CPS from hiring other staffing agencies. 2010 Contract at 4; *Instant Tech., LLC*, 40 F. Supp. 3d at 1012. And when CPS decided to solicit bids for its healthcare staffing needs, ten other firms besides ATC provided proposals. Compl. ¶¶ 31-33. What this shows is that not only are ATC's customers open to using other staffing agencies,

they are willing to do so, and they often have their pick from among many different agencies. *Id.* It is simply not the case that ATC provides a unique service that engenders customer loyalty, or that leads to near-permanent client relationships.

Second, none of ATC's allegations even suggest that its nurses acquired any sort of confidential information from CPS during the course of their employment with ATC. ATC's contract with CPS was not confidential, so the fact that CPS was an ATC customer was not something the nurses learned in confidence. *See* 2010 Contract at 14 (Section 9.5: "Contractor [meaning ATC] acknowledges that this Agreement and all documents submitted to the Board related to this contract award are a matter of public record … . Contractor further acknowledges that this Agreement shall be posted on the Board's internet website."); *Lifetec, Inc. v. Edwards*, 880 N.E.2d 188, 196 (Ill. App. Ct. 2007). Nor was it non-public that CPS relied on healthcare staffing agencies to supply its schools with nurses—indeed, at least ten other firms knew that CPS did this. *Id.* (concluding that customer information is non-protectable where it "is known by others in the trade"). And while it appears that ATC did provide the nurses (as well as CPS) with some training, Compl. ¶¶ 42-43, there is no hint in the Complaint or elsewhere that anything the nurses learned during their training was confidential or otherwise non-public. So ATC does not have a protectable interest in confidential information known by the nurses.

Finally, ATC's nurses are also not in a position (and never have been in a position) to compete with ATC. So ATC does not have a legitimate interest in

precluding its nurses from working for RCM in order to prevent them from taking ATC's customers. ATC's *nurses* are in the business of providing *healthcare* services, they are not in the business of providing *staffing* services. A business that reaches out to a staffing agency like ATC is not looking to hire employees on their own; they are looking to hire an agency to do that, and to do it on a large scale. ATC's nurses do not provide that type of service. Put another way, ATC was never at-risk of losing its business with CPS to any of its nurses. *Cf. H&M Comm. Driver Leasing, Inc. v. Fox Valley Containers, Inc.*, 805 N.E.2d 1177, 1184 (Ill. 2004) (covenant reasonable where plaintiff, a company that leases truck drivers and personnel, was seeking to protect its drivers from being hired away by its customers on a permanent basis). It has no protectable interest in this regard.

Because ATC does not allege a protectable interest in its non-compete clauses with its nurses, those non-compete clauses are invalid and cannot be relied upon to claim that RCM and CPS induced ATC's nurses to breach their employment agreements. Count 4 is dismissed.[9]

### E. Count 5: Breach of Contract
### (CPS Only)

Finally, ATC alleges that CPS breached the implied covenant of good faith and fair dealing by helping RCM "take over" ATC's nurses. Compl. ¶¶ 114-123. ATC contends that under the terms of its contract with CPS, CPS could only "take over"

---

[9]Because the Court concludes that Counts 3 and 4 fail on the merits, the Court does not address the Board's contention that it is absolutely immunized from liability for these torts under the Tort Immunity Act, 745 ILCS 10/1-101 *et seq*.

ATC's nurses in the event of a default, something that did not occur here. *Id.* ¶¶ 119-20. But ATC's claim again fails.

The implied covenant of good faith and fair dealing is not a stand-alone obligation, *In re Kmart Corp.*, 434 F.3d 536, 542 (7th Cir. 2006); it is a rule of construction that courts use "to determine the intent of the parties where a contract is susceptible to two conflicting constructions," *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003); *In re Kmart Corp.*, 434 F.3d at 542. To establish that CPS breached the duty of good faith and fair dealing, ATC would need to show that "the contract vested [CPS] with discretion in performing an obligation under the contract and [CPS] exercised that discretion in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties." *Bank of Am., N.A. v. Shelbourne Dev. Grp., Inc.*, 732 F. Supp. 2d 809, 823 (N.D. Ill. 2010) (internal quotation marks omitted). This ATC cannot do.

True, ATC's contract with CPS included a provision that allowed CPS to "take over" ATC's services in the event of a default. But it also contained provisions allowing CPS to terminate the contract at will, and to use as many or as few ATC nurses as it wished. A claim of bad faith cannot be premised on CPS's choice to exercise its clearly established rights under the contract. To the extent ATC is alleging that CPS violated the contract by supplying RCM with the contact information for each ATC nurse assigned to CPS, that allegation likewise fails. Nothing in ATC's contract with CPS states that the nurses' contact information is confidential. Nor is there any language in the contract obligating CPS to keep this

information private. The contract places an obligation *on ATC* to keep information it receives from CPS that is "generally not known to others" private, *see* 2010 Contract at 13 (Section 9), but no similar obligation is placed on CPS. *Cf. id.* ("Contractor [that is, ATC] shall not disseminate any information obtained in performance or delivery of Services and/or Materials for the Board to a third party without the prior written consent of the Board."). Because there is no ambiguous contractual provision on which to apply the implied covenant of good faith and fair dealing, this claim fails. CPS's motion to dismiss Count 5 is granted.

## IV. Conclusion

For the reasons discussed above, this case is dismissed. But, for the time being, it is dismissed without prejudice because ATC has not yet been given the opportunity to amend its complaint. *Childress v. Walker*, 787 F.3d 433, 441 (7th Cir. 2015); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). If ATC wishes to file an amended complaint, then it must do so by July 11, 2016. The Court resets the June 30, 2016 status hearing to July 13, 2016, at 9:45 a.m. The Court also encourages the parties to engage in settlement negotiations to save further delay and expense in resolving this litigation.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: June 28, 2016