UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ATC HEALTHCARE SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 08020 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| RCM TECHNOLOGIES, INC. and | ) | |
| THE BOARD OF EDUCATION OF THE | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

ATC Healthcare Services brought this suit against a competitor, RCM Technologies, and the Board of Education of the City of Chicago (which runs the Chicago Public Schools, so call them "CPS"). In the initial complaint, ATC alleged violations of the Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/2(a); the Illinois Consumer Fraud and Deceptive Business Practices Act (the Consumer Fraud Act), 815 ILCS 505/2; intentional interference with prospective economic advantage; breach of contract; and intentional interference with contract.[1] R. 1, Compl.[2] The claims arise from an alleged scheme by CPS and RCM to award the nurse-staffing contract for Chicago Public Schools to RCM and then have RCM

---

[1]The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332. The parties are completely diverse: ATC is a Georgia corporation, with its principal place of business in New York; RCM Technologies is a New Jersey corporation, with its principal place of business also there; and the Board of Education of the City of Chicago is a citizen of Illinois. R. 26. The amount in controversy exceeds $75,000. R. 51, Am. Compl. ¶ 6.

[2]Citations to the Court's docket are labeled as "R." followed by the docket number, and the applicable page or paragraph number.

1

take over all of ATC's nurses who were currently being used to staff the contract. *Id.* In June 2016, this Court dismissed the claims against RCM and CPS without prejudice. R. 47, 6/28/16 Opinion at 1. ATC has since filed an amended complaint asserting just the UDTPA, Consumer Fraud Act, and economic advantage claims. R. 51, Am. Compl. CPS and RCM again filed a joint motion to dismiss all the claims. R. 71, Mot. to Dismiss Am. Compl. For the reasons discussed below, the motion is granted in part and denied in part.

## I. Background

For the purposes of this motion, the Court accepts as true the allegations in ATC's amended complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). ATC Healthcare Services, Inc. is a healthcare staffing company who Chicago Public Schools (CPS) had contracted with to provide in-school nurses for its students with disabilities and special needs. R. 51, Am. Compl. ¶¶ 1, 8. ATC and CPS initially entered the contract in 2006, and through a series of renewals, the contract was set to continue through the 2015-16 school year. *Id.* ¶¶ 8-10. But CPS had the right to terminate the contract at any time so long as it gave ATC notice. R. 51-1 Exh. 1, 2010 Contract at 17 (Section 10.3). The contract also provided CPS with significant discretion in regulating the nursing services, Am. Compl. ¶ 11, assigning nurses to students, and modifying those assignments, while ATC had to comply with all of CPS' requirements unless it had a legitimate business reason to not do so, 2010 Contract at 5 (Section 2.2).

The nurses who ultimately provided the services were employees of ATC—contracted with and paid by ATC—not CPS. Am. Compl. ¶¶ 22-24. They provided a range of critical services to CPS students with disabilities and special needs, including "gastronomy tube feeding, tracheostomy care, ventilator care, medication through a nebulizer or other routes, assistance with range of motion and movement, the administration of medication, as well as urinary and bowel care." *Id.* ¶ 19. These nurses had unique skills and training, such as language fluencies, that allowed them to work with ESL (English as a Second Language) and special needs children in Chicago schools. *Id.* ¶¶ 20-21. The nurses were at-will employees of ATC. *Id.* ¶ 24. But many of them had been with ATC for over two years, although their contracts had to be renewed for each school year. *Id.* ¶ 28.

In November 2014, CPS decided to exercise its option to potentially terminate the contract and solicited bids from about 10 staffing firms, including ATC and Defendant RCM Technologies, for its outsourced nurse staffing needs. Am. Compl. ¶¶ 32-34. RCM claimed in its bid that it had "100 nurses ready" to staff the schools and that it would use a "rigorous interview, screening and evaluation process" to select nurses for assignments. *Id.* ¶ 39. But because continuity of care is so important for the children, RCM represented that it usually attempts to "inherit" or "take over" the nurses from the current provider, which it has historically done "on an annual basis" "with considerable ease." *Id.* ¶¶ 37-38.

ATC alleges that these representations were a lie intended to deceive the public into believing that the bidding process was not a sham. Am. Compl. ¶ 105.

3

Out of one side of its figurative mouth, ATC alleges, CPS had privately assured RCM that it was going to win the bid. *Id.* ¶ 48. At the same time, CPS acted as though it intended to continue working with ATC. *Id.* ¶ 52. When ATC sent CPS copies of its proposed 2015-2016 employment agreement, for example, a CPS official replied, "Thanks … . This looks great." *Id.* ¶ 53. CPS also asked ATC for a list of all currently assigned nurses and which schools they were assigned to, and ATC complied. *Id.* ¶ 54. During this time, CPS delayed its vote on the bid, causing ATC to incur training and recruitment costs to staff nurses in accordance with its existing contract, which it was still obligated to fulfill. *Id.* ¶¶ 46-52.

The first ATC heard that its contract was not going to be renewed was from a phone call on June 16, 2015, eight days before the Board publicly voted to approve RCM's competing bid. Am. Compl. ¶ 56. CPS sent a letter stating the same the next day. *Id.* CPS would not give ATC any reason why it had opted not to award ATC the new contract despite ATC's record of success, and according to ATC, never gave any indication that it was going to help RCM take over ATC's nurses to fulfill the 2015-2016 staffing needs. *Id.* ¶ 51. In fact, CPS still requested new nursing assignments from ATC two days after it sent them the letter. *Id.* ¶ 58.

After CPS formally voted to accept RCM's proposal on June 24, 2015, Am. Compl. ¶ 63, CPS informed ATC that it would not need any of its nurses for the remainder of the summer but did not terminate ATC's contract. *Id.* ¶¶ 64, 78. CPS also sent RCM the complete list of all of ATC's nurses who were currently assigned to the schools, including the nurses' contact information. *Id.* ¶ 65. RCM did not have

4

a formal contract in place with CPS but nevertheless began "aggressively soliciting" ATC's nurses—in particular the ones who had worked at CPS for several years—offering them exclusive positions at CPS. *Id.* ¶ 66-67. RCM told them it was taking over their contracts, and CPS joined in, calling the nurses and the parents of the students, telling them that the nurses would need to work for RCM in order to keep their assignments. *Id.* ¶ 68.

The solicitations grew more urgent as the school year approached. Am. Compl. ¶ 70. RCM implied that the nurses were already working for RCM by stating that they only needed to "confirm" their previous assignments. *Id.* ¶ 71. RCM also emailed the nurses—the email was marked "URGENT"—to tell them that they needed to be fingerprinted (though ATC had already done that), *id.* ¶ 72, and that they would receive referral bonuses for getting other nurses to sign up. *Id.* ¶ 76. ATC claims that this was a "ruse" to make the nurses think they were obligated to start working for RCM even though they were still ATC employees. *Id.* ¶ 73. But CPS still told ATC that it was reserving its rights under the 2015-2016 contract, so ATC might still have to provide nurses to some schools. *Id.* ¶ 78. Only two weeks before the start of the school year, on August 13, 2015, did CPS notify ATC that it was cancelling the contract, *id.* ¶ 77, and meanwhile RCM was still calling nurses to schedule them to assignments despite never hiring or screening them. *Id.* ¶ 81. RCM even implied that the solicitations were approved by ATC. *Id.* ¶ 82.

According to ATC, this led to problems on the first day of school. Am. Compl. ¶¶ 84-93. Scores of special needs children did not have nurses and were thus unable to attend class. *Id.* ¶ 92. This led to numerous calls to ATC from parents and school officials who, confused as to whether the nurses who were supposed to be assigned to the children were employed by ATC or RCM, asked where the nurses were. *Id.* ¶ 85-92. But ATC could only refer them to RCM and CPS, because ATC had no authority to send nurses. *Id.* ¶ 94.

ATC alleges that all of these actions were part of an unfair and deceptive scheme between RCM and CPS to allow RCM to take over ATC's contract and nurses. Am. Compl. ¶ 95. So ATC sued. The Court granted a motion to dismiss, but allowed ATC to file an amended complaint. The amended complaint asserts claims under the Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/2(a); the Illinois Consumer Fraud and Deceptive Business Practices Act (the Consumer Fraud Act), 815 ILCS 505/2; and for intentional interference with prospective economic advantage. Am. Compl. RCM and CPS now jointly move to dismiss the remaining claims under Rule 12(b)(6). R. 71, Mot. to Dismiss Am. Compl.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *McGowan v. Hulick*, 612 F.3d 636, 637 (7th Cir. 2010) (courts must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679; *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

## III. Analysis

### A. Uniform Deceptive Trade Practices Act (Count 1)
### (Against CPS and RCM)

ATC alleges that the attempted takeover of their nurses by CPS and RCM violated five sections of the Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/2(a), Am. Compl. ¶ 98, the purpose of which is to "*enjoin*[] … trade practices which confuse or deceive the consumer." *Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1156 (Ill. App. Ct. 1992) (emphasis added); *see Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1035 (N.D. Ill. 2003). The five sections which ATC alleges were violated state that "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: …

> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods and services;
>
> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;
>
> (4) uses deceptive representations or designations of geographic origin in connection with goods or services;
>
> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; …
>
> (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

815 ILCS 510/2(a); Am. Compl. ¶ 98. But ATC's allegations fail to state a claim for relief under the Act.

RCM and CPS argue that, because the UDTPA only provides for injunctive relief, ATC must allege that it is likely to suffer harm in the future from the deceptive conduct unless the court issues the injunction. R. 72, Def. Br. to Am. Compl. at 9-10. Because ATC has not alleged any threat of future recruitment or confusion (at this point in time) about which company provides the staffing services, they argue, ATC has failed to state a claim. *Id.* In support, they rely on *Int'l Star Registry of Ill. v. ABC Radio Network, Inc.* 451 F. Supp. 2d 982, 991 (N.D. Ill. 2006), *Murnik v. Kabo Chemicals, Inc.*, 1997 WL 567801, at *5 (N.D. Ill. Sept. 4, 1997), *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 904 F. Supp. 818, 822 (N.D. Ill. 1995), and *Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1337 (Ill. App. Ct. 1995), all of which dismissed claims under the UDTPA for not alleging a likelihood of future harm. Def. Br. to Am. Compl. at 9-10.

For its part, ATC does not respond to CPS and RCM's argument, which is enough to dismiss the claim by itself. Failure to respond to an argument in a motion to dismiss permits an inference of acquiescence to the argument which acts as a waiver. *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (holding that failure to respond to an argued interpretation of a contract, even one that was likely incorrect, constituted an acquiescence to that interpretation that acted as a waiver); *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) (noting that "[a]rguments not developed in any meaningful way are waived"); *see Alioto v. Town of Lisbon*, 2009 WL 3757005, at *5 (E.D. Wis. Nov. 6, 2009) (dismissing claim for not responding to the

9

defendants' arguments from their motion to dismiss), *aff'd*, 651 F.3d 715 (7th Cir. 2011).

Even if ATC had not waived this argument, this Court would have held that ATC failed to state claim because it did not allege any future harm. The likelihood of future harm occurring absent an injunction is an element of liability on the claim, not merely a separate element of damages. *Glazewski v. Coronet Ins. Co.*, 483 N.E.2d 1263, 1267 (Ill. 1985) (dismissing claim for not stating a cause of action under the UDTPA when the plaintiff did not allege they were "'likely to be damaged' by the defendant's conduct in the future"). ATC alleges only that CPS and RCM's actions caused lost revenue, lost productivity, and damage to the relationships with its nurses. Am. Compl. ¶ 108. All of these losses occurred over two years ago, for the 2015-2016 school year. *See Id.* ¶ 80. ATC does not (of course) allege that they are currently the staffing provider for CPS and that, absent an injunction, CPS and RCM will continue to deceptively solicit nurses or cause revenue losses. Similarly, the injunctive relief that ATC requests is only to prohibit RCM from contacting ATC's nurses in the future, stop CPS from giving out its nurses contact information, and stop CPS and RCM from recruiting any of its nurses. *Id.* But because CPS and RCM are not alleged to be likely to do that in the future, ATC fails to state a claim. Accordingly, the UDTPA claim is dismissed as to both Defendants.[3]

---

[3]Because the lack of allegations of a likelihood of future harm is dispositive on this claim, the Court does not need to consider whether likelihood of confusion is the sort of harm that is covered by the UDTPA.

## B. Consumer Fraud Act (Count 2)
## (Against RCM Only)

ATC next alleges that RCM's efforts to take over its nurses violated the Illinois Consumer Fraud and Deceptive Business Practices Act. 815 ILCS 505/2; Compl. ¶¶ 109-22. The Court initially dismissed this claim for failing to sufficiently plead a connection (or, in the words of various opinions, "nexus") between the wrongful acts alleged and consumer-protection concerns. 6/28/16 Opinion at 17. The Amended Complaint does not correct this flaw.

The Consumer Fraud Act was primarily enacted to protect consumers, borrowers, and business persons from unfair methods of competitions. *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). With that statutory purpose in mind, generally speaking only consumers can bring claims under the Act. *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1368 (N.D. Ill. 1996). But businesses can bring claims under the act in two specific circumstances. *Id.* The first scenario—when a business is the end consumer of a product–is not applicable here. *Vulcan Golf, LLC v. Google Inc.*, 552 F.Supp.2d 752, 777 (N.D.Ill.2008). But the second situation–whether the challenged conduct "involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns"—is potentially at issue. *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 41 (Ill. App. Ct. 1989). To implicate consumer protection concerns, there must be a connection between the alleged misconduct and the wider marketplace, as well as a connection between the requested relief and consumers generally. *Brody v. Finch Univ. of Health Scis./The*

*Chicago Med. Sch.*, 698 N.E.2d 257, 269 (Ill. App. Ct. 1998). Although ATC again attempts to make allegations to this effect, they still fall short.

First, ATC argues that the Act should be broadly construed to eradicate deceptive and unfair business practices generally. R. 77, Pl. Resp. Br. for Am. Compl. at 16. Because the practices engaged in by RCM and CPS were unfair, ATC argues, the Act should cover them. *Id.* But this argument fails to address the purpose of the statute, as interpreted by Illinois state courts: to protect *consumers*. *Web Commc'ns Grp., Inc. v. Gateway 2000, Inc.,* 889 F. Supp. 316, 323 (N.D. Ill. 1995) (citing cases). The Consumer Fraud Act is already more expansive and allows for more remedies than common law fraud and breach of contract claims. *Lake Cty. Grading Co. of Libertyville v. Advance Mech. Contractors, Inc.*, 275 Ill. App. 3d 452, 459, 654 N.E.2d 1109, 1115-16 (1995). So a broad reading of the statute to cover any unfair practice would expansively empower courts to author an unmoored better-business code of competition. Requiring a connection between the requested relief and *consumers* is thus important because it ensures that non-consumers do not expand the Consumer Fraud Act beyond its intended purpose. *See Lake Cty. Grading*, 275 Ill. App. 3d 452, 459, 654 N.E.2d 1109, 1115-16 (noting that courts have consistently resisted attempts to bring breach of contract claims under the Act by requiring that the alleged conduct implicate these concerns). ATC's argument that unfair conduct generally should state a cause of action—even when it does not affect consumers—is thus not persuasive.

ATC next argues that RCM targeted deceptions at the families of CPS students and that these families were affected by the deception. Pl. Resp. Br. for Am Compl. at 17. But most of the statements made by RCM in the bidding process (ATC lists tem in paragraph 39 of the Amended Complaint) are merely competitive puffery, not actual statements of *fact*, and cannot constitute actionable deceptive statements by themselves. The only arguably false or deceptive statement (and one that was capable of being verified one way or the other) that was made during the bidding process is that RCM had "100 nurses ready" to staff CPS schools as part of its bid. Am. Compl. ¶ 39. ATC alleges that this statement was made to "the public at large" because it was made to CPS. But ATC offers no support that a statement made to a government entity in a bidding process qualifies as a statement made to end users of the contracted-for services. So far as the Amended Complaint alleges, RCM did not market the bid to parents and students, and the representation was only public because the bidding process was public. The alleged misrepresentation was directed at *CPS*, and throughout the complaint, ATC alleges that CPS was in on the scheme. *See, e.g.*, *id.* ¶ 44 (alleging that CPS and RCM officials were planning to execute the takeover scheme). So even if the students are consumers for purposes of the Consumer Fraud Act, they were not directly implicated by the misconduct—that is, the alleged misrepresentation. And the relief requested— *ATC*'s lost profits and *ATC*'s costs in losing nurses—also has zero connection to the alleged adverse effects on the students.

To be sure, some cases have held that it is possible to state a valid claim in a business-to-business suit involving a deceptive act that flowed downstream to consumers. *See YCB Int'l, Inc. v. UCF Trading Co.*, 2010 WL 4781871 (N.D. Ill. Nov. 10, 2010); *Stickle Enterprises, Ltd. v. CPC Int'l, Inc.*, 1997 WL 767301 (N.D. Ill. Dec. 3, 1997). But those cases are different from this one. In *YCB*, the plaintiff-distributor was the direct recipient of the misrepresentation about the origin of ball bearings. *YCB Int'l*, 2010 WL 4781871 at *1. Here, CPS played that role—the direct recipient of the misrepresentation—not ATC. So the plaintiff in *YCB* was thus harmed directly by the misrepresentation (the ball bearings were of inferior quality), and that harm was passed on to consumers in the form of products that had incorporated the inferior ball bearings. *Id.* at *1, *5. In *Stickle*, misrepresentations about the use of contaminated grain pellets were again made directly to the claimant, CPC (which brought a counterclaim after being sued), and those misrepresentations would have directly harmed CPC by damaging its reputation in the marketplace and also would have harmed consumers by introducing contaminated feed into the market. *Stickle*, 1997 WL 767301 at *2, *4. In contrast, the middleman here, CPS—the direct recipient of the misrepresentation—is not the plaintiff and was not deceived or harmed by the alleged misrepresentation. Again, it is true that a business's actions, when akin to a consumer's actions, can help establish the necessary link to consumer harm and trigger the Consumer Fraud Act. *Brody v. Finch Univ. of Health Sciences,* 698 N.E.2d 257, 269 (Ill. App. Ct. 1998). The injured distributors in *YCB* and *Stickle*

satisfied that standard. But here, ATC's alleged suffering at the hands of RCM, and the relief that ATC seeks (its own lost profits and costs), are dissimilar to the distributors in those two cases. The Court thus grants RCM's motion to dismiss Count 2 for failing to have a sufficient connection to consumer protection concerns.[4]

### C. Interference with Economic Advantage (Count 3)
### (Against both RCM and CPS)

In Count 3, ATC alleges that RCM and CPS intentionally interfered with ATC's prospective economic advantage by soliciting its nurses to come work for RCM. Am. Compl. ¶ 127. In the prior Opinion, the Court noted that ATC had sufficiently pled the first two elements of this common law tort: (1) the plaintiff must have a reasonable expectancy of a valid business relationship with a third party; and (2) the defendant must know about it. 6/28/2016 Opinion at 19 (relying on *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (1991), and *Lynch Ford, Inc. v. Ford Motor Co., Inc.*, 957 F. Supp. 142, 145–46 (N.D.Ill.1997)). But the Court dismissed the claim for failing to plead the fourth element—the interference must injure the plaintiff—because the plaintiff did not allege that any nurses actually left their employment with ATC because of the solicitations. 6/28/2016 Opinion at 20 (citing *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998)). In the

---

[4] It is worth noting that RCM argues that the students are the "beneficiaries of the nursing services" rather than "consumer[s] of the staffing services." RCM's Br. at 6 (emphasis omitted). Although the Court need not decide this issue because the Consumer Fraud Act is not triggered, regardless of the students' classification, the Court was probably wrong to say, in the prior Opinion, that the students were the actual consumers of the services. 6/28/16 Opinion at 17. The Consumer Fraud Act defines consumers as those who "purchase[] or contract[] for the purchase of" services. 815 ILCS 505/1(e). That would be CPS in this scenario, not the students themselves.

15

Amended Complaint, ATC has fixed this flaw by adding the allegation that dozens of ATC employees actually terminated their employment with ATC. Am. Compl. ¶ 126. RCM and CPS now argue that ATC has failed to sufficiently allege damages because it did not allege that they were not able to fill other contracts with other clients due to the lost employees. Def. Br. to Am. Compl. at 15. But as this prior Opinion explained, ATC only needs to plead that they lost their employment relationship with their nurses to state a claim. 6/28/2016 Opinion at 20. Illinois courts have held that maliciously inducing at-will employees to leave their employment states a cause of action for the claim without discussing, at the pleading stage, the downstream effects of damages. *See ABC Trans Nat. Transp., Inc. v. Aeronautics Forwarders, Inc.*, 413 N.E.2d 1299, 1305–06 (Ill. App. Ct. 1980); *B. R. Paulsen & Co. v. Lee*, 237 N.E.2d 793, 796 (Ill. App. Ct. 1968). No doubt damages will be explored during discovery and probably contested as the case progresses, but at this stage of the case, this element of the claim is sufficiently pled.

RCM and CPS also contend that ATC has failed to allege that they have intentionally interfered with the expectancy. Def. Br. to Am. Compl. at 15. They claim that the term "actively recruited" is a conclusion and not a factual allegation. *Id.* But this argument fails to take into account the rest of the allegations throughout the Amended Complaint. For example, ATC specifically alleges that both RCM and CPS made false representations to the nurses that their positions were confirmed and that needed to contact RCM for scheduling purposes only. Am.

Compl. ¶¶ 71, 79. These are intentional acts which, when construed in the light most favorable to ATC, state a plausible claim for tortious interference.

Finally, RMC and CPS argue that ATC has not overcome the competitor's privilege. Def. Br. to Am. Compl. at 15-18. But this does not take into account that competitor's privilege is an *affirmative defense* to tortious interference with business advantage. *Gen. Motors Corp. v. State Motor Vehicle Review Bd.*, 862 N.E.2d 209, 220 (Ill. 2007). It would be one thing if Illinois law placed on a plaintiff the burden to plead a complaint in such a way as to defeat the competitor's privilege. But the Illinois Supreme Court classifies the competitor's privilege as an affirmative defense. *Id.* ATC is generally not required to plead around an affirmative defense to survive a motion to dismiss. *U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003); *Serv. By Air, Inc. v. Phoenix Cartage & Air Freight, LLC*, 78 F. Supp. 3d 852, 868-69 (N.D. Ill. 2015). The case cited by CPS and RCM, *Flexicorps, Inc. v. Trend Technologies, Inc.*, is thus distinguishable, because it was decided on summary judgment. 2002 WL 31018353, at *12 (N.D. Ill. Sept. 10, 2002). To be sure, sometimes a meritorious affirmative defense can be so readily obvious on the fact of the complaint that a Rule 12(b)(6) dismissal is allowed. *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 731 (7th Cir. 1999). But ATC has not pled itself out of court in the Amended Complaint. In *International Marketing*, the plaintiff (IML) included an allegation that the defendant falsely represented that IML did not have a direct contact for supplying a commodity. *Id.* at 732. The court noted that this allegation would have been sufficient to state a tortious

interference with prospective advantage claim even though it does not reference spite or malice because the statement does not have a competitive motivation, but IML made this allegation only in reference to its contract claims. *Id.* Here, ATC has added the allegation that CPS concealed the scheme between it and RCM so that ATC would continue to pay the expenses of training and vetting the nurses even though both CPS and RCM intended to take over the nurses. Am. Compl. ¶ 45. It remains to be seen whether those facts alone would be enough to survive the summary judgment stage (as distinct from the plausibility standard applied at this pleading stage), but for now the allegation does suggest more than mere competitive motive to survive a dismissal motion. If true, then that conduct went beyond mere competitive motive and instead plausibly represents an attempt to inflict extra costs on ATC. The claim for interference with economic advantage survives the motion to dismiss.

### D. Illinois Tort Immunity Act

Finally, CPS argues that the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101 *et seq.*, provides the Board with immunity against the economic-advantage claim. In particular, CPS cites to four sections of the Tort Immunity Act. But none of them apply, at least not to all the allegations comprising the tortious interference claim. First, Section 2-106 immunizes only "oral" promises or misrepresentations. Some of the alleged misrepresentations to ATC's nurses were in writing, including via email. Am. Compl. ¶ 72. As discovery progresses and a finite set of facts comprising the claim

becomes clear, it might very well be that the basis for CPS's liability will be narrowed (and jury instructions to that effect would be appropriate). But dismissal of the claim is inappropriate because of the alleged written communications.

Second, Section 2-210 immunizes "negligent" misrepresentations, whether in writing or made orally. But the allegations, which much be accepted as true, plausibly set for an *intentional* interference with economic advantage, comprised of *intentional* misrepresentations to ATC's nurses. Again, CPS might well be entitled to a jury instruction to ensure that the jury does not premise liability on negligence. But this section does not help CPS dismiss the entirety of the claim.

Third, Section 2-107 immunizes local governments against libel or slander. But that is not the surviving claim. Tortious interference with economic advantage does not necessarily rely on libelous or slanderous statements, and indeed that is not what ATC is alleging when it says that Defendants essentially tricked ATC's nurses into thinking that they had already become RCM employees. So this section too does not defeat the claim.

Fourth and finally, Section 2-201 immunizes local governments against claims premised on their employees' policy determinations and exercises of discretion. It would be one thing if the tortious interference claim sought to challenge CPS's decision to award the staffing contract to RCM. That decision would be a prototypical policy determination and an exercise of discretion. But that is not what ATC targets with the tortious interference claim. Instead, ATC seeks relief for CPS's alleged interference with ATC's employment relationship with its

nurses, and those allegations are independent of the policy decision to terminate the contract with ATC and award it to RCM. None of the immunities apply, at least not entirely to defeat the tortious interference claim.

## IV. Conclusion

For the reasons discussed, the motion to dismiss the Deceptive Trade Practices Act and the Consumer Fraud Act claims is granted, and this time the dismissals are with prejudice, because ATC has already amended the complaint. But the claim for tortious interference with economic advantage remains intact. The status hearing of October 12, 2017, remains as scheduled. The parties shall confer on a discovery schedule and file a joint Rule 26(f) report by October 10, 2017. At the least, Rule 26(a)(1) disclosures will be due by October 23, 2017, and the first round of written discovery requests shall be issued no later than that date.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2017