UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ATC HEALTHCARE SERVICES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 08020 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| RCM TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff ATC Healthcare Services, Inc. provided temporary nursing staffing services to the Chicago Public School District from 2006 until August 2015, when CPS terminated its contract. ATC has now sued the agency that replaced it, RCM Technologies, Inc., for intentional interference with prospective economic advantage, claiming that RCM improperly interfered with the employment relationship between ATC and the nurses whom it staffed at CPS schools. R. 51, First Am. Compl.[1] After a

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332. The parties are completely diverse: ATC is incorporated in Georgia, with its principal place of business in New York; RCM Technologies is incorporated in New Jersey, with its principal place of business also in New Jersey. R. 26, Joint Jurisdictional Stmt. ¶¶ 2-3. The amount in controversy alleged exceeds $75,000. First Am. Compl. ¶ 6.

ATC's original complaint also brought claims under the Deceptive Trade Practices Act and the Consumer Fraud Act. R. 1, Compl.; First Am. Compl. Those claims were dismissed with prejudice from the First Amended Complaint. R. 93., Op. and Order.

period of discovery, RCM filed a motion for summary judgment. R. 140, Mot. Summ. J.[2] For the reasons explained below, RCM's motion is granted.

## I. Background

In setting out the facts, the Court views the evidence in the light most favorable to ATC (the non-movant) and, where important, also describes the parties' competing factual contentions. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Before the summer of 2015, ATC and two other agencies provided nursing services to schools in the Chicago Public School District. R. 155, Pl.'s Resp. DSOF ¶ 10; R. 166, Def.'s Resp. PSOF ¶ 1. During the 2014-2015 school year, ATC provided 147 nurses to CPS, for a total of about 2,800 hours each week. Def.'s Resp. PSOF ¶ 2. ATC's contract for the school year was set to expire on June 30, 2016. Def.'s Resp. PSOF ¶¶ 1, 7; R. 154-2, PSOF Exh. A, ATC-CPS Contract Renewal at 1.

In November 2014, CPS issued a request for proposal (RFP) for nursing services. Pl.'s Resp. DSOF ¶ 11; R. 154-4, PSOF Exh. E, Nov. 2014 RFP. The RFP did not specifically state whether it sought proposals for an exclusive nursing services provider, or for a more limited contract. *See* Def.'s Resp. PSOF ¶ 5 (calling the RFP a request for "non-exclusive, nurse staffing services."); Pl.'s Resp. DSOF ¶ 11. It did state, however, that CPS might try to bundle as many schools as possible under the same provider. Def.'s Resp. PSOF ¶ 5; Nov. 2014 RFP at 27 ("It is the intention of the Board to award these contract(s) in whole or in part or by item as may be in the best

---

[2]The motion was originally filed on behalf of both RCM and the Board of Education of the City of Chicago, which ATC had also sued. Compl.; First Am. Compl. ATC voluntarily dismissed its claim against the Board after briefing began. R. 150, Stip. of Dismissal.

2

interest of the Board. … The Board may award multiple sections or all sections of this request for proposal to a qualified Proposer. It is the Board's desire to bundle as many zones as possible, where it is in the Board's best interest."). Both ATC and RCM submitted proposals. Pl.'s Resp. DSOF ¶¶ 11, 41.

In April or May of 2015, RCM learned that the CPS Procurement Department planned to recommend that the CPS Board grant the new contract to RCM.[3] Pl.'s Resp. DSOF ¶ 12; *see also* Def.'s Resp. PSOF ¶ 16; R. 154-14, PSOF Exh. K, Hay Dep. Tr. at 60:8-16. The Board approved that proposal at its meeting on June 24, 2015. Pl.'s Resp. DSOF ¶ 13; Def.'s Resp. PSOF ¶ 9; R. 154-10, PSOF Exh. G, CPS Board Action at 4. Both CPS and RCM issued press releases announcing that the contract was awarded to RCM. Def.'s Resp. PSOF ¶ 9; R. 154-11, PSOF Exh. H, Board Press Release; R. 154-12, PSOF Exh. I, RCM Press Release. RCM's press release stated that it would be the new "exclusive vendor" of nursing services and would provide around 170 nurses to staff CPS schools. RCM Press Release at 1-2. Neither press release, however, stated exactly when RCM's contract would begin. Def.'s Resp. PSOF ¶ 10. ATC learned that RCM had been awarded the contract at some point that same month—June 2015—though ATC disputes whether it understood that news to mean that ATC's existing contract would be terminated. Pl.'s Resp. DSOF ¶ 14.[4] CPS

---

[3]RCM's reply brief states that ATC admitted that CPS's procurement representative informed *ATC* that RCM would be recommended to the Board. R. 165, Def.'s Reply Br. at 3-4. In support, RCM cites to ATC's response to Paragraph 12 of RCM's Statement of Material Fact. *Id*. But that paragraph says only that CPS informed *RCM* of its upcoming recommendation. Pl.'s Resp. DSOF ¶ 12. So contrary to the reply brief, ATC does not appear to admit that CPS called ATC to let it know that it would be recommending CPS.

[4]ATC alleges that it learned from CPS in June 2015 that it would not receive a new contract to provide nursing services after the *following* year, that is, after July 2016. Def.'s

3

officially terminated ATC's existing contract almost two months later on August 13, 2015. R. 154-13, PSOF Exh. J, Termination Letter; Def.'s Resp. PSOF ¶ 11.

ATC's version of events is that RCM knew all along—and long before ATC—that it would be receiving an exclusive contract, a deal much bigger than CPS let on in the RFP and beginning sooner than ATC could have guessed. Def.'s Resp. PSOF ¶¶ 17-19 ("RCM knew for months in advance of any public announcement they would receive a contract greater both in time and scope than initially advertised in CPS' original RFP."). All public information, ATC argues, pointed toward RCM's new contract being supplemental to the existing nursing services that CPS already had in place—at least until after ATC's contract expired. Def.'s Resp. PSOF ¶¶ 5-6, 19-20 ("[N]o publicly available information contradicted ATC's belief that their contract with CPS expired on July 1, 2016 and that RCM would provide supplemental staffing services in advance of their New Contract."). In contrast, RCM argues that all the parties knew that the contract being awarded to RCM was an exclusive one and that RCM would take over all nursing services for the 2015-2016 school year. *See* Def.'s Resp. PSOF ¶¶ 5-6 n.1 (providing a link to a June 2015 Chicago Reporter article in which Cindy Weiner, an outside staffing representative hired by ATC, stated that the ATC contract would be "phased out" in July 2015); PSOF Exh. B, Weiner Dep. Tr.

---

Resp. PSOF ¶ 8. RCM disputes that point. *Id*. The testimony upon which ATC relies, from Cindy Weiner's deposition, shows that CPS called Weiner to let her know that RCM was the successful bidder under the 2014 RFP. *See* R. 157, PSOF Exh. B, Weiner Dep. Tr. Part 1 at 39:4-40:11. RCM is correct that this testimony does not suggest anything about whether ATC's existing contract would be renewed in *2016*. *Id*.


Part 1 at 48:4-12 (testifying that she knew in June 2015 that RCM had been awarded an exclusive contract).

In any event, ATC contends that it toiled away throughout the summer, continuing to train nurses and preparing to assign them to CPS locations. Def.'s Resp. PSOF ¶¶ 25-26 ("ATC conducted normal preparations for the upcoming school year and incurred expenses of approximately $10,000 in doing so."); *id.* ¶¶ 18-19 ("On June 9, 2015, CPS requested a 'final list of nurse assignments' from ATC and was provided one shortly thereafter.'") (quoting R. 154-17, PSOF Exh. N, CPS-ATC Emails 6/9/15 at 1); Def.'s Resp. PSOF ¶ 23 ("In the spring of 2015, ATC had 147 nurses assigned to CPS and reasonably expected to provide approximately the same number for the 2015-2016 school year."); *id.* ¶ 27 ("ATC submitted their proposed [employment agreement] modifications to CPS on June 8, which were approved on June 10, 2015."). After all, ATC points out, the existing contract required ATC to continue providing nursing services until CPS officially terminated it. Def.'s Resp. PSOF ¶¶ 20-21. In response, RCM argues that ATC has offered no evidence to prove that it did any work at all during the summer of 2015. Def.'s Resp. PSOF ¶ 25,[5] Pl.'s Resp. DSOF ¶ 52 (failing to dispute RCM's claim that "[d]uring the summer of 2015, ATC did not provide training to nurses who were assigned to CPS.").

---

[5]RCM is correct that the excerpts from Weiner's deposition that ATC cites to support this contention are not exactly on point. *See* PSOF Exh. B, Weiner Dep. Tr. Part 1 at 42:5-24, 43:1-5. It is also true that ATC failed to file the third page of Weiner's affidavit on the docket. *See* R. 154-5, PSOF Exh. F, Weiner Aff. at 2-4. So the Court cannot credit ATC's claims about its preparations for the 2015-2016 school year.

After RCM was awarded the contract—and during the time when ATC (according to ATC) was still in the dark about the imminent contract termination—RCM began proactively reaching out to ATC's nurses to recruit them to work for it instead of for ATC. Def.'s Resp. PSOF ¶¶ 34-39; *see also* Pl.'s Resp. DSOF ¶¶ 24-26, 36. ATC argues that RCM's communications with the nurses were misleading and confused the nurses. Def.'s Resp. PSOF ¶¶ 34-35; R. 154-5, PSOF Exh. F, Weiner Aff. ¶¶ 19, 21. Specifically, ATC alleges that RCM misled nurses when it told them "to contact RCM to 'continue their assignment,'" Def.'s Resp. PSOF ¶¶ 36-37 (quoting Weiner Aff. ¶ 21), and when it sent them an email instructing them to get fingerprinted, Def.'s Resp. PSOF ¶ 36; R. 154-7, Weiner Aff. Exh. 2, Fingerprinting Email. ATC also emphasizes that recruiting ATC's nurses was part of RCM's transition plan all along. Def.'s Resp. PSOF ¶¶ 13-15. In that sense at least, the plan worked: RCM ultimately hired many ATC nurses, including 41 nurses whom ATC claims had worked for ATC for at least two years before they left to join RCM's ranks. Def.'s Resp. PSOF ¶ 39.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550

U.S. 372, 378 (2007) (cleaned up).⁶ The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

ATC's claim against RCM is for tortious interference with a prospective business relationship. Under Illinois law, that tort has four elements: "(1) [the plaintiff's] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into

---

⁶This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991).

### A. Intentional Interference

RCM argues that ATC has failed to establish a dispute of material fact on the third element of the tortious interference claim. R. 139, Def.'s Summ. J. Br. at 9-13. Illinois courts have explained that "'purposeful' or 'intentional' interference refers to some impropriety committed by the defendant in interfering with the plaintiff's expectancy of entering into a valid business relationship with the third party." *Romanek v. Connelly*, 753 N.E.2d 1062, 1073 (Ill. App. Ct. 2001) (cleaned up) (citing *Dowd & Dowd v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998) ("[A] plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference'—that the defendant has committed some impropriety in doing so.")); Restatement (Second) of Torts § 766B, Comment a (1979) ("In order for the actor to be held liable, this Section requires that his interference be improper.") (cited by *Dowd*, 693 N.E.2d at 371). Courts consider various factors in determining whether interference is improper, including "the nature of the actor's conduct" and "the actor's motive." Restatement (Second) of Torts § 766B(a)-(b) (1979) (cited by *LaRocco v. Bakwin*, 439 N.E.2d 537, 542-43 (Ill. App. Ct. 1982)). "[P]hysical violence, fraudulent misrepresentation and threats of illegal conduct are ordinarily wrongful means." Restatement (Second) of Torts § 767 (1979).

The bulk of ATC's argument on intentional interference is that RCM used "a barrage of false and misleading solicitations" to induce ATC's nurses to sign on with

8

RCM instead of continuing their at-will contracts with ATC. R. 153, Pl.'s Resp. Br. at 12-15. ATC offers three theories of deception.

The first alleged misrepresentation involves an email that RCM allegedly sent to ATC nurses asking them "to contact RCM … to submit required fingerprinting, despite the fact that RCM knew that fingerprinting of existing agency nurses was not required by CPS." Def.'s Resp. PSOF ¶ 36; Weiner Aff. Exh. 2, Fingerprinting Email. The email is from an RCM recruiter and instructs the recipient, "[Y]ou must update your fingerprints. … In order to start on time you MUST complete your prints ASAP. … Before you can care for the children of Chicago it is a requirement that you be fingerprinted and cleared to work in CPS." Weiner Aff. Exh. 2, Fingerprinting Email at 1. The rest of the email provides instructions on where and how to get fingerprinted. *See generally id.* ACM argues that the statements in the email were misleading because "RCM knew … that existing agency nurses were not required to 'update' their fingerprints." Pl.'s Resp. Br. at 14. ATC further contends that the email implied to the recipients that they were *RCM* employees, even though at the time they were still ATC employees. *Id.* ("[A]t the time ATC nurses were receiving this communication from RCM, *they were ATC employees* who had never applied to or in any way agreed to work for RCM.") (emphasis in original).

No reasonable juror could find that the fingerprinting emails were intentionally misleading or fraudulent. *See* Restatement (Second) of Torts § 767 (1979) ("A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient."). To

9

be sure, it is certainly possible that nurses who received the email were confused about whether they needed to submit new fingerprints. But there is no improper motive that explains *why* RCM would want to make ATC nurses think that they had to be fingerprinted when they did not. R. 165, Def.'s Reply Br. at 7-8 ("ATC never explains what possible motive RCM would have to tell a nurse that fingerprinting would be required if in fact it would not be."). Instead, there are various innocent (or to use the tort element's lingo, not "improper") possibilities for why the email contained the instruction, including that it was sloppily drafted or mistakenly sent to too broad a group of nurses. For example, there is some language in the email suggesting that the instruction is really meant only for new hires—not for nurses who have previously worked in CPS schools: "Before you can care for the children of Chicago it is a requirement that you be fingerprinted and cleared to work in CPS." Weiner Aff. Exh. 2, Fingerprinting Email.

More importantly, even viewing the evidence in ATC's favor and granting ATC all reasonable inferences, there simply is no statement in the email that would misleadingly induce an ATC employee to sign on with RCM. The email does not suggest that recipients were already RCM employees, or that they would not have a choice about whether to pursue employment with RCM. No reasonable juror could conclude from this evidence that RCM intended the recipients of the email (all of whom were, by definition, educated nurses) to understand something false about their employment situation. So the fingerprinting email cannot be the basis of ATC's intentional-interference claim.

Second, ATC alleges more generally that its nurses were confused by RCM's recruitment calls, and that those phone calls were intentionally misleading. Pl.'s Resp. Br. at 12-13; Def.'s Resp. PSOF ¶¶ 34-35; Weiner Aff. ¶ 19. That argument relies on testimony from Weiner (ATC's outside staffing consultant) that nurses reported their confusion directly to her. Weiner Aff. ¶¶ 19-21. There are several problems with that argument. Most fundamentally, ATC fails to allege exactly *why* the nurses were confused or to identify a specific deceptive statement. Bare testimony to the effect that nurses were "confused," standing alone, is not evidence on which a jury could reasonably rely to find confusion. Imagine that Weiner were to offer that testimony at a trial without any more explanation. The Court would strike the testimony as lacking foundation, because the jury would have no way to evaluate it without additional concrete facts. ATC has failed to explain, for example, *who* reported being confused, *when* the alleged report was made, and *what* was the basis of the confusion. So, even though Weiner's testimony about the nurses' confusion is probably not excludable hearsay (the statements could be expressions of the declarants' state of mind, *see* Fed. R. Evid. 803(3)), it would be inadmissible for lack of foundation.

Finally, ATC alleges that RCM misled the nurses by telling them that they could "continue their assignment" by contacting RCM. Def.'s Resp. PSOF ¶¶ 36-37 (quoting Weiner Aff. ¶ 21). ATC's theory is that because the assignments were originally given by ATC, RCM would not have the power to "continue" those "assignments" once ATC's contract ended. Pl.'s Resp. Br. at 6-7; *see also* Def's Resp.

11

PSOF ¶ 37. Even granting all reasonable inferences to ATC, this stretches too much what an objectively reasonable nurse would understand about "continu[ing]" his or her "assignment." In context, the only reasonable interpretation of that statement is that if the nurse wanted to continue working at the specific CPS school, then the nurse must contact RCM. That was a true statement: RCM could require nurses to contact RCM as a condition of continuing the assignment. Indeed, RCM was the *only* company that could make sure a nurse had that option once ATC's contract was terminated. No reasonable juror could find anything false—much less intentionally misleading—in this statement.

Moving beyond the alleged misrepresentations, ATC also makes a broader argument for improper interference: that RCM and the Board conspired to keep ATC in the dark "to ensure a takeover of ATC's nurses by RCM at the eleventh hour before the start of the next school year." Pl.'s Resp. Br. at 9-11. The idea is that if ATC had known earlier in the summer that it was going to lose the CPS contract, it would have had time to find other work for its nurses, and they would not have gone to work for RCM. *Id.* at 9. But ATC does not allege any actual conduct by RCM that was intended to keep ATC in the dark—besides RCM's failing to publish the start date of its contract, *id.*, an omission that does not fall under any of the traditional categories of impropriety ("violence, fraudulent misrepresentation[, or] threat[] of illegal conduct"). Restatement (Second) of Torts § 767 (1979).[7] And ATC does not attempt to establish

---

[7]As an aside, it is far from clear that ATC *was* in the dark. As described above, there is some evidence that ATC knew in June 2015 that RCM's new contract was exclusive, and that ATC's contract would ultimately have to be terminated to make way for RCM. *See* Def.'s Resp. PSOF ¶ 6 n.1 (including the link to a Chicago Reporter article in which Weiner stated

12

that RCM had any kind of affirmative duty to inform ATC of the terms of its new contract either. The conspiracy argument must fail, even with the benefit of reasonable inferences. No reasonable juror could find an improper or unlawful interference on this evidence.

### B. Competitor's Privilege

RCM has also argued that its actions in this case were privileged. Def.'s Summ. J. Br. at 14-18. The competitor's privilege "allows one to divert business from one's competitors … provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *Gen. Motors Corp. v. State Motor Vehicle Review Bd.*, 862 N.E.2d 209, 220 (Ill. 2007) (quoting *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 7-8 (Ill. App. Ct. 1995) (explaining that the privilege applies unless a competitor's actions are "solely motivated by spite or ill will"). The parties seem to agree that RCM and ATC are competitors such that the competitor's privilege *could* apply in this case. *See* Pl.'s Resp. DSOF ¶¶ 1, 6, 41 (establishing that ATC and RCM were in the same line of business and competed for the same contract).

Even in circumstances in which the competitor's privilege might apply, of course, improper or unlawful means of interference are *not* privileged. *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 867 (7th Cir. 1999) ("We agree … that the tort of interference with business relationships should be confined to cases in which the defendant employed unlawful means to stiff a competitor."); *The Film and Tape*

---

that ATC's contract with CPS would be "phased out" in July 2015); R. 157, PSOF Exh. B, Weiner Dep. Tr. Part 1 at 48:4-12 (Weiner testifying that she knew in June 2015 that RCM had been awarded an exclusive contract); *see also* RCM Press Release at 1 (stating that RCM would be the "exclusive vendor" for nursing services at CPS).

*Works, Inc. v. Junetwenty Films, Inc.*, 856 N.E.2d 612, 620 (Ill. App. Ct. 2006) ("[E]ven though competition will justify interference with a business relationship, if the maner of interference is improper, the interference will be actionable."). Improper—and thus unprivileged—acts "include fraud, deceit, intimidation, or deliberate disparagement." *Soderlund Bros.*, 663 N.E.2d at 8; *see also* Restatement (Second) of Torts § 768, Comment e (1979) (suggesting that the range of improper acts in a competitor's privilege case is narrower than in a dispute between two parties who are *not* competitors). RCM's argument is that ATC fails to raise evidence of the type of improper or unlawful acts that are required to defeat the privilege. Def.'s Summ. J. Br. at 18.

In evaluating the competitor's privilege, it is not exactly clear whose burden it is to prove that the elements of the competitor's privilege do or do not apply. RCM believes it is ATC's. *See* Def.'s Summ. J. Br. at 15. ATC does not take a clear position, *see* Pl.'s Resp. Br. at 18-19, and the case law provides only limited guidance. Some cases refer to the privilege as an "affirmative defense," implying that it is the defendant's burden to prove it. *See Gen. Motors Corp.*, 862 N.E.2d at 220; *Soderlund Bros.*, 663 N.E.2d at 8. On the other hand, the Seventh Circuit has noted that the question of whether a party has used improper or wrongful means overlaps almost perfectly with the impropriety element of the intentional interference tort, suggesting that the burden should stay with the plaintiff on both points. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398-99 (7th Cir. 2003); *see also Nation v. Am. Capital, Ltd.*, 682 F.3d 648, 651 n.2 (7th Cir. 2012) ("Illinois courts have been unclear

14

about whether the issue of conditional privilege is part of plaintiff's claim—that is, an aspect of the plaintiff's burden to prove that the defendant's interference with his contract was unjustified—or an affirmative defense to be proved by the defendant."). Similarly, the Restatement Second of Torts frames the privilege not as an affirmative defense but simply as a clarification of how the third element of the tort applies in scenarios in which the plaintiff and defendant are competitors. Restatement (Second) of Torts § 768 (1979) (explaining that "[o]ne who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor …does not interfere improperly with the other's relation" under certain circumstances).

Ultimately, the Court need not decide who bears the burden of proof, for the same reason as the Seventh Circuit explained in *Cromeens*: there simply is not a genuine issue of material fact on whether RCM used improper means regardless of who bears the burden. *See Cromeens*, 349 F.3d at 399 ("Whether it is an element of the claim or an affirmative defense, if the [plaintiffs] are unable to demonstrate a genuine issue of material fact on that point, their claim cannot survive summary judgment."). For the reasons explained earlier in the Opinion, no reasonable juror could find that RCM used fraud or deception, or any other improper or unlawful method of interference, even if RCM bears the burden to prove the privilege's applicability.

15

## C. Reasonable Expectancy

Finally, RCM argues that ATC has not been able to raise a genuine dispute of material fact on the second element of its intentional interference claim, that is, a reasonable expectancy of entering into a valid business relationship with the nurses that RCM poached. Def.'s Summ. J. Br. at 8-9. The issue turns largely on *when* ATC knew or should have known that its contract with CPS for the 2015-2016 school year would be terminated, as well as whether it could have expected that it would be able to find other work for its CPS-assigned nurses. *See id*; Pl.'s Resp. Br. at 8-11. Given that ATC has been unable to produce evidence creating a genuine dispute on the third element and the competitor's privilege, however, the Court need not decide this issue.

## IV. Conclusion

For the reasons explained above, RCM's motion for summary judgment, R. 140, is granted. Final judgment shall be entered. The status hearing of October 17, 2019 is vacated.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 5, 2019